In re UNR INDUSTRIES, INC., Unarco Industries, Inc., Unr, Inc., Unr-Rohn, Inc., (Alabama), Unr-Rohn, Inc., (Indiana), Jobal Tube Co., Inc., Unr Products, Inc., and Folding Carrier Corporation, Debtors.

Bankruptcy Nos. 82 B 9841–9845, 82 B 9847, 82 B 9849 and 82 B 9851.

United States Bankruptcy Court, N.D. Illinois, E.D.

April 21, 1987.

as soon as Peterson commenced its collection efforts and thus no award is appropriate.

Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., for debtors.

Ross & Hardies, Chicago, Ill., for Unsecured Creditors Committee.

DeFrees & Fiske, Chicago, Ill., for Official Creditors Committee of Asbestos-Related Plaintiffs.

Kevin Forde, Ltd., Chicago, Ill., Legal Representative.

Peat, Marwick, Mitchell & Co., Chicago, Ill., Accountants for Unsecured Creditors' Committee.

## MEMORANDUM OPINION AND ORDER

DAVID H. COAR, Bankruptcy Judge.

This matter comes before the Court on the debtors' motion to extend the time in which the debtors shall have the exclusive right to file plans of reorganization. The debtors' motion is vigorously opposed by the Unsecured Creditors Committee, the Official Creditors Committee of Asbestos Related Plaintiffs, the Legal Representative, and the Senior Noteholders. The parties have filed briefs in support of their respective positions. For the reasons stated below, the debtors' exclusive right to file plans of reorganization is extended for 60 days and on the Court's own motion, an examiner is hereby appointed to perform such duties as described in this Opinion.

### I. Background

The debtors are a group of affiliated corporations which can collectively be referred to as "UNR." Faced with the expense of defending itself against 17,000 asbestos-related tort and wrongful death suits brought by persons who had been exposed to asbestos manufactured by UNR, and with the potential liability to the 30,000 to 120,000 people who may contract an asbestos-related disease in the future, UNR filed for relief under Chapter 11 of the Bankruptcy Code on July 29, 1982. UNR was the first corporation to resort to Chapter 11 as a solution to its financial problems brought on by the avalanche of asbestos-related tort and wrongful death suits.[1] *See, Manville Corporation v. The Equity Security Holders Committee (In re Johns-Manville Corporation)*, 66 B.R. 517 (Bankr.S.D.N.Y.1986); *In re Amatex Corporation*, 755 F.2d 1034 (3rd Cir.1985); *In re Forty-Eight Insulations, Inc.*, 58 B.R. 476 (Bankr.N.D.Ill.1986). Nearly five years have passed since the commencement of the UNR bankruptcy case. UNR filed a plan of reorganization on June 5, 1986. However, progress toward the confirmation of any plan of reorganization in the UNR bankruptcy is not in sight. *Cf. In re Johns-Manville Corporation*, 68 B.R. 618 (Bankr.S.D.N.Y.1986) (order confirming plan of reorganization entered December 18, 1986). Nevertheless, the attorneys, accountants and other professionals employed in this case have generated enormous fees over the course of the UNR bankruptcy.[2] On March 6, 1986, the Court imposed a moratorium on fees which was directed at those bankruptcy counsel and other professionals who were deemed responsible for the progress (or lack of progress) made toward the confirmation of a plan of reorganization in the case. This moratorium is still in effect. *In re UNR Industries, Inc.*, 72 B.R. 796 (Bankr.N.D. Ill.1987).

### II. The Underlying Dispute

Section 1121(b) of the Bankruptcy Code gives Chapter 11 debtors the exclusive right to file a plan, and that right remains with the debtor "until after 120 days after the date of the order for relief" is entered. 11 U.S.C. Section 1121(b). Under Section

---

1. For further discussion on this asbestos-related Chapter 11 proceeding, *see In re UNR Industries, Inc.*, 725 F.2d 1111 (7th Cir.1984); *In re UNR Industries, Inc.*, 46 B.R. 671 (N.D.Ill.1985); *In re UNR Industries, Inc.*, 71 B.R. 467 (Bankr.N.D.Ill. March 9, 1987).

2. Approximately $18,916,984.65 in interim fees and $2,418,014.54 in expenses have been awarded to the attorneys, accountants and other professionals employed in the UNR bankruptcy.

1121(d), "on request of a party in interest and after notice and a hearing, the court may for cause reduce or increase the 120 day period ..."[3]

Since the filing of its bankruptcy case, UNR has requested and the Court has extended the period in which UNR has the exclusive right to file a plan (commonly referred to as the "exclusive period"). On December 17, 1986, UNR again filed a motion to extend the exclusive period. The Unsecured Creditors Committee, the Official Creditors Committee of Asbestos-Related Plaintiffs and the Legal Representative have filed a joint response and memorandum in opposition to UNR's motion.[4] The Senior Noteholders have also filed a memorandum in opposition to UNR's motion.[5] The United States Trustee has not taken a position on whether the exclusive period should be extended.[6]

UNR argues that it has been deprived of a meaningful opportunity to negotiate a plan and this constitutes cause for the further extension of the exclusive period. UNR further insists that it has not engaged in dilatory conduct with respect to negotiations on the plan of reorganization, and, therefore, this, too, constitutes cause for the extension of the exclusive period. There are several uncertainties that the debtors argue should be resolved before they should be deprived of the exclusive right to file a plan. The first uncertainty deals with the question as to whether future claimants are creditors with claims as defined by the Bankruptcy Code. 11 U.S.C. 101(4), (9), *In re UNR*, 71 Bankr. 467 at 471. Although raised, this question has not been resolved by the Seventh Circuit or any other circuit court. *See, In re UNR*, 725 F.2d 1111. Related to this uncertainty is UNR's attempt to notify future claimants of the pendency of its bankruptcy case by its efforts to send out a notice to future claimants which sets a bar date for the filing of claims pursuant to

3. The 1984 amendment to section 1121 became effective to cases filed 90 days after July 10, 1984, which was the date the Bankruptcy Amendments and Federal Judgeship Act of 1984 was enacted, Pub.L. 98–353, Tit. III, Section 506. Therefore, section 1121 as it existed prior to the 1984 Amendments governs this case since the UNR bankruptcy was filed on July 29, 1982, and it provides as follows:

§ 1121 Who may file a plan.

(a) The debtor may file a plan with a petition commencing a voluntary case, or at any time in a voluntary case or an involuntary case.

(b) Except as otherwise provided in this section, only the debtor may file a plan until after 120 days after the date of the order for relief under this chapter.

(c) Any party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may file a plan if and only if—

(1) a trustee has been appointed under this chapter;

(2) the debtor has not filed a plan before 120 days after the date of the order for relief under this chapter; or

(3) the debtor has not filed a plan that has been accepted, before 180 days after the date of the order for relief under this chapter, by each class the claims or interests of which are impaired under the plan.

(d) On request of a party in interest and after notice and a hearing, the court may for cause reduce or increase the 120-day period

or the 180-day period referred to in this section.

4. Although the Legal Representative was originally appointed and designated to represent unknown putative asbestos-related claimants, *In re UNR Industries, Inc.*, 46 B.R. 671 (Bankr.N.D.Ill. 1985), the bankruptcy court recently held that the Legal Representative represents "future claimants" which term has been defined as those persons who have been exposed to UNR's asbestos, have not yet gotten sick, but who, in the future, will be diagnosed as having an asbestos-related disease as a result of that exposure. *In re UNR Industries, Inc.*, 71 Bankr. 467 (Bankr.N.D.Ill.1987).

5. The Senior Noteholders are a group of 11 insurance company lenders with undisputed, unsecured claims in the aggregate amount of $21,583,334.00. These 11 insurance companies are: Bankers Life Company, Nationwide Life Insurance Company, New England Mutual Life Insurance Company, IDS Life Insurance Company, Guarantee Mutual Life Company, The Ohio National Life Insurance Company, State Farm Life Insurance Company, Pan-American Life Insurance Company, Board of Pensions of the Lutheran Church of America and The Great-West Life Assurance Company.

6. Mark Bernstein, an attorney in Hawaii who represents an individual who was exposed to UNR's asbestos, has filed a declaration in support of UNR's motion to extend the exclusive period.

Bankruptcy Rule 3003(c)(3). This notice and bar date order was entered by the Bankruptcy Court on August 12, 1986, upon UNR's motion, and it is now on appeal before the district court, and its effects have been stayed pending appeal. The circumstances surrounding the bar date order, according to UNR, constitute cause for the extension of the exclusive period.

The second uncertainty is concerned with whether UNR is a solvent corporation. Before this can be determined, UNR argues that several lawsuits must be resolved. First, UNR has initiated a lawsuit in the district court against its insurance carriers for their failure to indemnify and cover UNR for losses suffered with respect to its asbestos liabilities. If it is successful in this litigation, UNR will recover over $100 million from its insurance carriers. Second, UNR has also filed a lawsuit against the United States Government under the Tucker Act, 28 U.S.C. Sections 1346, 1491, in the Court of Claims, which suit seeks damages for breach of asbestos supply contracts and indemnification for losses UNR has incurred or will incur as a result of its asbestos liabilities. Finally, in a motion for summary judgment now before the District Court in Pennsylvania on the objection to the claims of certain asbestos claimants, UNR has asserted the so-called "government contract defense", and if this defense is valid, UNR believes that the vast majority of asbestos-related claims would be eliminated.[7] All these lawsuits have a direct impact on the question of UNR's solvency. If these lawsuits are resolved in UNR's favor, then UNR argues that it can pay all of its creditors in full and UNR's shareholders can retain substantially all their interest in the newly organized company.

The position of the Committees, the Legal Representative, and the Senior Noteholders is summarized in the argument that by extending the exclusive period, UNR is in effect given undue bargaining power in its negotiations with its creditors, and. that Congress intended to eliminate this imbalance which existed under the Bankruptcy Act when it enacted section 1121(d) of the Bankruptcy Code.

> ... Chapter XI gives the debtor the exclusive right to propose a plan. Creditors are excluded. The exclusive right gives the debtor undue bargaining leverage, because by delay he can force a settlement out of otherwise unwilling creditors, and they have little recourse except to move for conversion of the case ... The debtor is in full control, often to the unfair disadvantage of creditors.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 231 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787.

The dispute between UNR and its creditors arises in the context of whether the exclusive period should be extended. However, the underlying dispute is really over what percentage of equity UNR's shareholders are going to retain in the post-confirmation UNR. Negotiations on a plan of reorganization are stalled. The parties have staked out their positions and have refused to move.

In the opinion of this Court a negotiated, consensual plan of reorganization is the best route to take. The alternative which might be brought on if the exclusive period were ended could be disastrous. The claims in this case could very well exceed the value of the corporation, leaving nothing or very little for equity shareholders. With everything to lose, the equity shareholders have every incentive to litigate those legal issues which have a bearing on UNR's solvency. If UNR is reorganized via a section 1129(b) "cramdown" then, as UNR correctly notes, the litigation and the legal issues which have a direct impact on UNR's solvency would have to be resolved,

---

**7.** This is because of the fact that under the government contract defense doctrine, government contractors who manufacture products according to the specifications established by the United States Government share in the immunity extended to the United States in suits brought by servicemen, or their relatives, for injuries which arise out of, or in the course of, activity incident to military service. *Tillett v. J.I. Case Company,* 756 F.2d 591, 596–97 (7th Cir.1985). Therefore, UNR as a government contractor would be immune from liability from claims asserted by those subject to the defense.

i.e. the insurance litigation, the litigation against the United States Government, the government contract defense asserted against asbestos claimants, and the status of the future claimants under the Bankruptcy Code. At best, these matters could be resolved in five years. Realistically, after all the appeals are taken, it could take a decade to resolve these matters. If the UNR bankruptcy has to be resolved through litigation there would be few winners, if any.[8] The group which would stand to lose the most would be the asbestos disease victims who, since the commencement of the UNR case on July 29, 1982, have not received any compensation on their claims. The court in *Johns-Manville* undoubtedly had these fears:

> ... the risks of attempting a reorganization via Code section 1129(b) cramdown over nonconsenting classes superior in rank to common shareholders is unrealistic given the nature of an essentially consensual plan now out for vote ... While there is no certainty that the current plan can clear the hurdles of confirmation under 11 U.S.C. 1129, there is far less certainty that any other plan has a chance at a run for confirmation within an acceptable period of time ... The end to exclusivity would result in competing plans ... The problems and complexities in the slow and painful process of building this consensus, which have been described above, would exponentially explode in the context of competing plans advanced by parochial interests. Even if only a shareholders plan should emerge in competition with the present plan, the unfolding of the statutory confirmation scheme would replicate the delay already experienced.

*In re Johns-Manville*, 66 B.R. at 536, 537.

### III. The Court's Role

What can this Court do short of taking the exclusive period away from UNR to get the negotiations moving in this case. It has been suggested that this Court should take an active role in the negotiations.

This course of action, however, should and will be avoided by this Court. With the enactment of the Bankruptcy Code in 1978, Congress sought to remove the administration of bankruptcy cases away from bankruptcy judges in the hope that impartiality could be achieved. These concerns are echoed throughout the legislative history.

> Without undertaking to determine whether the criticisms of referees for permitting their relationships with the bankruptcy bar to become too close are justified, the Commission believes that making an individual responsible for conduct of both administrative and judicial aspects of a bankruptcy case is incompatible with the proper performance of the judicial function. Even if a paragon of integrity were sitting on the bench and could keep his mind and feelings insulated from influences which arise from his previous official connections with the case before him and with one of the parties to it, he probably could not dispel the appearance of a relationship which might compromise his judicial objectivity. The Commission accordingly recommends that the bankruptcy judges be removed from the administration of bankrupt estates and be restricted to the performance of essentially judicial functions, that is, primarily to the resolution of disputes or issues involving adversary parties and matters appropriate for judicial determination.

*Report of the Commission on the Bankruptcy Laws of the United States*, H.R. Doc. No. 93–137, 93rd Cong., 1st Sess. 93, 94 Pt. 1 (1973).

Congress particularly intended to limit the evils that occurred as a result of the bankruptcy judge's administration of business reorganization cases.

> These problems are particularly acute in business rehabilitation cases. In chapter X corporate reorganization cases, the judge must appoint the trustee, and then work with the trustee in the conduct of the business. The appearance of unfair-

---

**8.** Over the course of a decade and assuming that the current trend continues, the attorneys, accountants and other professionals would, of course, generate additional fees and expenses in excess of $40 million.

ness generated when the judge's appointee appears before the judge for a hearing is magnified because the judge must work so closely with the trustee in the management of the business undergoing reorganization. Though there is not a trustee in a chapter XI or chapter XII arrangement case, the judge works closely with the debtor in possession in the management of the business. It is in these cases in which the judge's personal responsibility for the success or failure of a case is intense, with the consequent appearance of bias in the judge's consideration of disputes that arise in the case ... the structure of the system, written into the Bankruptcy Act as law, necessitates the awkward position in which the bankruptcy judges find themselves, and brings disrepute on the whole system. The law must be changed to afford bankruptcy litigants the fair and impartial justice to which all other litigants in the federal courts are entitled.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 91 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787.

Although Congress intended to remove case administration away from the bankruptcy judge this does not mean, however, that the bankruptcy judge should bury his head in the sand when confronted with a case which does not appear to be making any significant movement. The bankruptcy judge still has the responsibility to manage his cases and to move them toward a point of resolution in such a way as to promote fairness to all parties. On this point, the Fifth Circuit has recently observed:

We recognize that Congress, in 1978, amended the bankruptcy laws with the intention of removing bankruptcy judges from the administration of the debtor's estate. (citations omitted) The purpose of this amendment was to insure the impartiality of the bankruptcy judge.

We do not believe, however, that Congress thereby intended to relieve the bankruptcy judge of the responsibility of managing the cases before him in such a way as to promote the objectives and goals of the Bankruptcy Code. Our conclusion in this respect is strengthened by the fact that the bankruptcy court is an adjunct of the district court. District Court judges function under Fed.R.Civ.P. 16 with full power and responsibility to manage their cases and with the directive to move their cases in such a way as to promote fairness to the parties and judicial economy. These responsibilities are not incompatible with their judicial function; indeed, they are at the core of it. We recognize that the line between administration of the debtor's estate that would jeopardize the bankruptcy judge's impartiality and effective case management may sometimes be a difficult one to draw. Nevertheless, we think that each bankruptcy judge is called upon to manage the cases in front of him, fairly and impartially, in such a way as to promote their orderly and prompt disposition. The difficulty in ascertaining where the line is to be drawn cannot be an excuse for a judge's abdication of his responsibility to function as a judge.

*United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd. (In re Timbers of Inwood Forest Associates, Ltd.)*, 808 F.2d 363, 373–74 (5th Cir. 1987).

With these policy considerations in mind, and in order to get the UNR plan negotiations moving, this Court, on its own motion, shall appoint an examiner whose primary task will be to monitor the status of negotiations conducted among the parties.

## IV. The Appointment of an Examiner

Section 1104(b) governs the appointment of examiners.[9] Under that provision, "the

9. 11 U.S.C. § 1104(b) provides:
If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the United States trustee, and after *notice and a hearing, the court shall* order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor or

court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate ... [where] such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." 11 U.S.C. Section 1104(b)(1).[10]

Section 1104(c) governs the method for appointing examiners. "If the court orders the appointment of ... an examiner, ... the United States trustee, after consultation with parties in interest shall appoint, subject to the court's approval, one disinterested person other than the United States trustee to serve as examiner." 11 U.S.C. 1104(c). Under Section 105(a) the Court on its own motion can move for the appointment of an examiner.[11] Even prior to 1986 Amendments to Section 105(a), courts exercised authority to appoint examiners on their own motion. As one court commented, "the court need not stand helplessly by hoping that a party in interest might ask for the appointment of an examiner." *In re Landscaping Services, Inc.,* 39 B.R. 588 (Bankr.E.D.N.C.1984)

Section 1106(b) sets forth the duties of examiners. Section 1106(b) allows an examiner to perform the duties of a trustee set forth in section 1106(a)(3) and (4), "except to the extent that the court orders otherwise, any other duties of the trustee that the court orders the debtor in possession not to perform." 11 U.S.C. Section 1106(b). The legislative history to section 1106(b), however, contains a broader mandate. It is abundantly clear that it is within the court's discretion "to give the examiner *additional duties as the circumstances warrant.*" H.R.Rep. No. 595, 95th Cong. 1st Sess. 404 (1977); S.Rep. No. 989, 95th Cong. 2d Sess. 116 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *See, In re Carnegie International Corporation,* 51 B.R. 252 (Bankr.S.D.Ind.1984). Examiners have been authorized to bring suits on behalf of debtors, *In re Carnegie International Corporation,* 51 B.R. 252. Examiners have been appointed with expanded powers simply to avoid the consequences associated with being designated as the trustee. *In re Boileau,* 736 F.2d 503 (9th Cir.1984); *In re John Peterson Motors, Inc.,* 47 B.R. 551 (Bankr.D.Minn.1985) (a trustee designation would, for example, force debtor's management out of office). Examiners have been appointed to assist the court in determining whether confirmation requirements and the debtor's good faith have been met. *In re Landscaping Services, Inc.,* 39 B.R. 588. In addition to determining whether there is sufficient cause to appoint an examiner, the Court must analyze and consider the costs of such an appointment and whether the benefit to the estate outweighs the cost and expenses created by the examiner's appointment. *In re Gilman Services, Inc.,* 46 B.R. 322 (Bankr.Mass.1985)

## V. The Examiner

1. The United States Trustee is hereby ordered to appoint an Examiner within ten days of the entry of this order.

2. The primary role of the Examiner shall be to determine whether negotiations toward a consensual plan of reorganization are at an impasse. In making this determination, the Examiner shall have full power to inquire of various parties as to their

or by current or former management of the debtor, if—
(1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
(2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.

**10.** Under 11 U.S.C. section 102(3) the words, "includes" and "including" are not limiting; therefore, the enumeration of duties listed in paragraph (b) of section 1104 are not exhaustive.

**11.** Section 105(a) provides:
**11 U.S.C.S. § 105. Power of court**
(a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title [11 U.S.C.S. §§ 101 et seq.]. No provision of this title [11 U.S.C.S. §§ 101 et seq.] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

positions in negotiations and to mediate any differences that exist. This mediative role is a necessary concomitant of the Examiner's determination regarding impasse. The Examiner must have the power to test the strength of each party's resolve and the assumptions underlying each party's position. The Examiner shall not seek to achieve any substantive result in negotiations, but rather to determine whether impasse exists and, where appropriate, to facilitate the resolution of substantive differences.

3. Notice of Appointment of Examiner shall be filed by and hearing on any objections of the Examiner shall be held on May 7, 1987 at 10:00 a.m.

4. The Examiner is to hold an initial meeting with UNR, the Committees, the Legal Representative, the Senior Noteholders and any other interested party five days after the entry of the order approving the appointment of the Examiner. At the initial meeting, the parties are to submit to the Examiner in writing a statement outlining their positions with respect to negotiations on a plan of reorganization.

5. After the initial meeting, the Examiner shall meet on a regular basis with the Committees, the Legal Representative, the Senior Noteholders and any other interested party, either individually or in a group.

6. Three weeks after the initial meeting, the Examiner is to file an initial written report informing the Court as to the status of the negotiations on the plan of reorganization.

7. The appointment of this Examiner is predicated upon Section 105(a), Section 1104, and Section 1106 of the Bankruptcy Code. 11 U.S.C. Sections 105(a), 1104, 1106. The Court further concludes that there is sufficient cause warranting the appointment of an Examiner, and that the benefit to the debtors' estates outweighs the cost and expenses created by the Examiner's appointment.

8. The time in which UNR shall have the exclusive right to file plans of reorganization is hereby extended for an additional 60 days, until July 13, 1987, or until such other date as the Court shall, upon notice to the parties, determine.