**In re NICOLET, INC., Debtor.**

**Bankruptcy No. 87–03574S.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Dec. 24, 1987.

As Amended Jan. 29, 1988.

---

Gary M. Schildhorn, Philadelphia, Pa., for Creditors' Committee.

Edward C. Toole, Jr., Mary F. Walrath, Susan L. Parsons, Philadelphia, Pa., for debtor.

Virginia Gibson–Mason, Asst. U.S. Atty., Philadelphia, Pa., for U.S.

James J. O'Connell, Philadelphia, Pa., Asst. U.S. Trustee.

Leslie E. Bowser, Blank, Rome, Comisky & McCauley, for asbestos claimants.

Hal Pitkow, Philadelphia, Pa.

Melvin Brookman, Brookman, Rosenberg, Brown & Sandler, Philadelphia, Pa.

Gene Locks, Lee Bolefsky, Greitzer & Locks, Philadelphia, Pa.

Robert E. Paul, Paul, Reich & Myers, Philadelphia, Pa.

Donald Marshall, Philadelphia, Pa.

John W. Haigis, Philadelphia, Pa., for multiple creditors.

Charles M. Golden, Philadelphia, Pa., for proposed committee of asbestos health claimants.

Roland P. Gagnon, LAB Chrysotile, Thetford Mines, QC Canada.

Lydia Isales, Office of Regional Counsel, U.S.E.P.A., Philadelphia, Pa.

George Allison, Allison, MacKenzie, Hartman, Sombeniotis & Russell, Ltd., Carson City, Nev.

Rona J. Rosen, Klehr, Harrison, Harvey, Branzburg, Ellers & Weir, Philadelphia, Pa.

Charles A. Klein, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The instant Chapter 11 filing by a former manufacturer of products containing asbestos, the fallout from which has caused it to become a target for in excess of 50,000 asbestos-related lawsuits, presents two Motions pitting the Debtor against the Official Unsecured Creditors' Committee (hereinafter referred to as "the Committee") appointed in the case, which prompt us to address, in more detailed fashion than we

have in the past, several pervasive issues relevant to Chapter 11 cases and other bankruptcy cases.

The first issue, arising from the Committee's motion to file a legal action on behalf of the Debtor, causes us to recognize a broad right of the Committee to so proceed when the Debtor fails to do so, but to deny the Motion here because the Committee's Motion spurred the Debtor to file the action itself, and the Committee may insure that this matter will be vigorously pursued by exercising its right to intervene therein. The other motion, that of the Debtor seeking to extend the periods in which it exclusively may file and obtain acceptances for a Chapter 11 plan, causes us to address the second issue—the burden of a debtor on such motion—and to conclude that a debtor must present evidence to successfully meet its burden on such a motion. This determination leads us to consider the third issue, the extent to which we can incorporate prior proceedings in this same case into the record on this motion to provide the requisite evidence. We do not find the effort of the Debtor to incorporate the entire record sufficient to meet its burden, without prior notice of its intention to do so to the Committee. However, the unusual and complex nature of this case prompts us to provide the Debtor with another chance to do so in a hearing scheduled expeditiously hereafter.

The underlying bankruptcy case was initiated by the filing of a voluntary Chapter 11 petition on July 17, 1987. On the date of filing, the Debtor was met with an attempt to obtain relief from the automatic stay by the State of Maryland and two of its municipalities who wished to complete discovery in which they were engaging up to the date of filing and which, in their view, was rudely interrupted by this filing. After a hearing on August 6, 1987, we resolved this matter with an Order of August 12, 1987, permitting the discovery as to only actions against third parties at the cost of the governmental bodies.

Shortly after filing, the Debtor filed a motion for permission to utilize cash collateral securing a rather modest debt to LAB Chrysolite, Inc. On August 20, 1987, it filed a motion for permission to sell a significant portion of its realty located in Ambler, Pennsylvania. The Committee, which we authorized to employ counsel on August 24, 1987, expressed immediate vigorous interest in these motions, particularly after learning, upon the Debtor's filing of its Schedules on September 28, 1987, that the Debtor had transferred over $3,000,000.00 in dividends, over $400,000.00 in management fees, and about $1,350,000.00 in loan repayments to its parent and sole shareholder, NuNic, Inc. (hereinafter referred to as "NuNic") in the three years preceding the filing of its bankruptcy case.

On October 1, 1987, we entered an Order granting the Committee the right to take a Bankruptcy Rule 2004 Examination of the Debtor on or before October 7, 1987, in light of the fact that a continued cash collateral hearing was scheduled on October 8, 1987. When the examination and a meeting of counsel for the Committee with certain officers of the Debtor at the Debtor's place of business in lieu thereof did not come off as planned, and the Debtor's counsel indicated its unavailability to reschedule the 2004 Examination until November, the Committee filed a Motion for Contempt of the Order allowing the 2004 Examination and Imposition of Sanctions upon the Debtor's counsel. On October 20, 1987, we ordered the Examination to take place on or before the end of the day on October 26, 1987. We also entered an Order approving a cash collateral stipulation that day over the Committee's relatively mild objection, the motion to sell realty having been withdrawn.

On that date, October 20, 1987, the Committee, also turned its attention to recovering, for the benefit of the estate, the assets transferred by the Debtor to its parent, filing an "Emergency Motion" for leave to commence suit against NuNic to recover the payments of dividends, management fees, and debt payments to NuNic totalling in excess of $4,600,000.00. The Committee itself was named as plaintiff in the proposed Complaint attached to the Motion.

Pending the hearing on this Motion on November 18, 1987, two other related Motions were filed. On October 30, 1987, the Committee filed a motion requesting that all "surplus funds" of the Debtor be paid into escrow, in order to prevent any further transfers of the Debtor to NuNic or any other related entities. After a hearing on December 1, 1987, we resolved this motion in an Order of December 2, 1987, requiring the Debtor to report all of its disbursements, by transferee and amount, to the Committee on a weekly basis.

On November 13, 1987, the Debtor filed a motion to extend the exclusivity periods in which it alone could file and obtain acceptances of a Plan, for 90 days, i.e., from November 16, 1987, to February 15, 1988, to file a plan, and from January 13, 1988, to April 12, 1988, to gain acceptances of a plan. The hearing on this Motion was scheduled on December 10, 1987.

We should also relate one other development, i.e., the awakening of various counsel representing some of the plaintiffs in the 50,000 asbestos-related lawsuits, which are apparently not the constituency of the Committee. On October 29, 1987, we entered an Order establishing December 31, 1987, as a bar date for claims, and, on November 10, 1987, allowed publication notice of the bar date in six newspapers as notice of the bar date to the multifarious and allegedly unknown claimants asserting asbestos-related injuries. On December 1, 1987, counsel representing numerous such claimants appeared before us and raised concern about the establishment of the bar date and the lack of participation of claimants generally, a phenomenon which puzzled us but which we were powerless to investigate. At a hearing on an expedited Motion to vacate the Order establishing the December 31, 1987, bar date, we vacated that Order and invited all interested counsel to provide input as to when the bar date should be established and whether some shorthand method of filing Proofs of Claim should be established. We also learned that a motion to appoint a separate Creditors' Committee for tort claimants had been filed, and it was scheduled for a hearing on January 12, 1988.

At the hearing on the Committee's instant Motion on November 18, 1987, the Committee called three witnesses which it subpoenaed to appear: (1) Richelle Hittinger, the President of the Debtor; (2) Theodore Metzendorf, the outside accountant of NuSN, Inc. (hereinafter referred to as "NuSN"), the vendor of the Debtor's stock to NuNic in 1984, who also was a present Trustee of the Jennie Perelman Foundation; and (3) A. Stephen Rosa, the outside accountant for the Debtor and NuNic.

At the hearing, it was established that NuNic owns all of the stock of the Debtor, having acquired same from NuSN on March 28, 1984. All of the stock of NuSN is owned by Raymond G. Perelman, who recently merged NuSN with another company of which he is sole owner named Chayes Virginia, Inc. All of the stock of NuNic is owned by the Jennie Perelman Foundation, of which Mr. Perelman and his wife were the sole Trustees until March 28, 1984, at which time Mr. Metzerdorf and Central Penn National Bank were appointed as Trustees. At present, Mr. Metzerdorf and an associate are the sole Trustees.

From 1984 until November 5, 1987 (when several of the Debtor's officers resigned from their positions with NuNic), the period of the transfers in issue, the Debtor and NuNic shared common officers and directors. The Debtor, NuNic, and NuSN use the same address in Ambler. NuNic also owns all of the stock in a company called N.T. Realty Company (hereinafter referred to as "N.T. Realty"), of which Ms. Hittinger is also a director.

As indicated above, on March 28, 1984, NuSN purchased the stock of the Debtor, at that time transferring to NuNic the stock in exchange for NuNic's promissory note for $3,269,008.00 in favor of NuSN, repayment of which was to commence on March 29, 1985, and continue in equal monthly installments, plus interest, until March 28, 1989.

The Debtor paid dividends totalling $3,257,000.00 to NuNic for the years ending March 31, 1985 ($1,267,000.00), 1986 ($430,000.00) and 1987 ($1,560,000.00). In

early 1987, the Debtor repaid to NuNic the amount of $1,348,081.18, allegedly on account of certain loans, the terms of which are unclear. From July, 1986, until July, 1987, the Debtor paid management fees to NuNic totalling $404,000.00. It appears that the source of funds utilized by the Debtor to pay NuNic was insurance settlements paid to the Debtor from 1984 to 1986 by carriers which issued policies to the Debtor covering the asbestos-related claims. NuNic apparently used the dividend payments from the Debtor to repay the stock purchase obligation to NuSN. Also, sometime during 1986, the Debtor sold real estate located in Norristown to N.T. Realty for which, although valued at $166,000.00, N.T. Realty has never paid the Debtor.

It appears that the Debtor was grossly insolvent when the above-described transfers were made. For the fiscal years ending March 31, 1986, and March 31, 1987, the Debtor recorded operating losses of $1,418,343.00, and $839,792.00, respectively. In 1987, claims conservatively estimated by the Committee at over $133,000,-000.00 were outstanding against the Debtor. Only apparently $5,000,000.00 in insurance coverage remains in place. The Debtor's Schedules value its assets at but $629,-403.16.

At the close of the hearing on the Committee's Motion, we indicated our intention to enter an Order, ultimately executed on November 19, 1987, allowing the parties until December 1, 1987 (the Committee), and December 8, 1987 (the Debtor), to file their respective Briefs. On December 8, 1987, the Debtor filed not only its Brief, but an Adversary proceeding, at Adv. No. 87–0999S, against NuNic and N.T. Realty, seeking recovery of the payment on the loan, the management fees, and the dividends, based upon most of the Bankruptcy Code and state law theories advanced by the Committee in its proposed Complaint against NuNic plus an accounts receivable claim for $166,000.00 against N.T. Realty. Our colloquies with counsel at the December 10, 1987, hearing on the Debtor's motions to extend the exclusivity periods confirm that the Committee is pressing its Motion despite the presence of Adv. No. 87–0999S.

The hearing on the Debtor's motion before us, on December 10, 1987, was dramatically briefer than the proceedings of November 18, 1987. The Debtor offered into evidence the Docket Entries in the main case, to which the Committee did not object. The Debtor then offered into evidence all of the pleadings and documents in the main case *en masse.* The Committee did object to this offer. By Order of December 11, 1987, we directed the parties to simultaneously file Briefs "on the issue of whether all matters in the case file can be admitted into the record and the merits of the Motion simultaneously on or before December 17, 1987."

■ We are, as noted at the outset, addressing both Motions in this single Opinion. We shall address the Committee's "Emergency Motion" for leave to file suit on behalf of the Debtor first. While several considerations coelesce to cause us to observe that the Committee would have been entitled to file a legal action, in its own name, if the Debtor had persisted in its refusal to do so, we are forced to conclude that the Debtor's institution of Adv. No. 87–0999S must result in our denial of the Committee's motion at this time.

The first consideration in our assessment of the general legal issue of the right of a creditors' committee to file suit on behalf of a seemingly-reluctant debtor-in-possession (hereinafter referred to as "DIP") is the liberal approach which has been employed by the Courts of Appeals which have considered the question. Of particular note are the decisions in *Coral Petroleum, Inc. v. Banque Paribas–London,* 797 F.2d 1351, 1362–63 (5th Cir.1986); and *In re STN Enterprises,* 779 F.2d 901, 904–06 (2d Cir.1985). These decisions evince a functional approach rather than a technical approach to the issue. Thus, in *Coral Petroleum,* the Court, although declining to allow a Committee to bring suit there because it found its underlying cause of action to be without merit, appears to require only a showing that a Committee's cause

has merit and that the DIP refused to sue to succeed in such a motion, as oposed to requiring a Committee to make any further showing of extenuating circumstances. In *STN*, the Court's principal concerns were "whether an action asserting such claim(s) is likely to benefit the reorganization estate," 779 F.2d at 905, and whether the Committee's "fee arrangement with its attorney will in no event impose a net burden on the bankruptcy estate." *Id.* at 906.

While the Third Circuit Court of Appeals has not addressed the issue of the right of a Committee to bring suit on behalf of a DIP, its decision in *In re McKeesport Steel Castings Co.*, 799 F.2d 91 (3d Cir.1986), portends what such a decision would be likely to be. In that case, the Court allowed a creditor, Equitable Gas Co., to maintain an action for its own benefit under 11 U.S.C. § 506(c), even though the Code specifically states that only "the trustee" may proceed under that section. The analyses of the Court is extremely functional: the creditor is allowed to proceed because "neither the debtor in possession nor a creditors' committee has reason to make a claim on behalf of Equitable ..." *Id.* at 94. Thus, we infer that the Court would utilize a functional approach in the analogous instant situation and determine that a Committee could maintain an action on behalf of a DIP as long as the claim had any merit and the DIP was, for any reason at all or for no reason, failing to maintain the action in prompt fashion.

The second is the strong stance that the Third Circuit Court of Appeals has taken regarding the right of a Committee to intervene in legal proceedings brought by the DIP. In *In re Marin Motor Oil, Inc.*, 689 F.2d 445, 456, 457 (3d Cir.1982), the Court established a "broad and absolute construction of section 1109(b)," which provided the absolute right of a Committee to intervene in any action of the DIP. *See In re Hanover Industrial Machine Co.*, 61 B.R. 551 (Bankr.E.D.Pa.1986) (per GOLDHABER, CH.J.) (*Marin* result unchanged by current Bankruptcy Rules). Our decision that intervention generally should be analyzed liberally and functionally in *In re United Minerals & Grains Corp.*, 76 B.R. 991,

996–1000 (Bankr.E.D.Pa.1987), is consistent with this reasoning.

Since a Committee is thus allowed to participate with the DIP in any action which the DIP chooses to bring as a co-plaintiff, it seems to us a very small additional step to allow a Committee to initiate litigation on behalf of the DIP itself, without the DIP's participation, in a situation where the DIP should be proceeding on its own.

Finally, following *McKeesport*, we have been reluctant to prevent a creditor from maintaining a meritorious action against other creditors upon the sole basis of lack of standing. *In re Morrison*, 69 B.R. 586, 588–90 (Bankr.E.D.Pa.1987). As we stated there and in other contexts, "we are most reluctant to decide issues put before us on the ground that a party avidly expressing a legal position should not be allowed to do so on the basis of lack of standing." *In re United Church of the Ministers of God*, 74 B.R. 271, 276 (Bankr.E.D.Pa.1987). *See also In re Young*, 70 B.R. 968, 970–71 (Bankr.E.D.Pa.1987). To refuse to allow a Committee prepared to bring a potentially-meritorious action on behalf of a reluctant DIP is, in our view, exalting the concept of standing beyond the consideration of practicalities of the basic bankruptcy precept requiring the DIP, as a fiduciary of its creditors, *see, e.g., Wolf v. Weinstein*, 372 U.S. 633, 642–45, 83 S.Ct. 969, 975–77, 10 L.Ed.2d 33 (1963), to take an action which will clearly serve their common interest.

We observe that the vast majority of bankruptcy court decisions have authorized Committees to institute actions for reluctant DIPs, although some courts are careful to state that the DIP must be the nominal plaintiff. *See In re Curry & Sorenson, Inc.*, 57 B.R. 824, 828–29 (9th Cir. Bankr.App.1986); *In re Jermoo's, Inc.*, 38 B.R. 197, 200 (Bankr.W.D.Wis.1984); *In re Toledo Equipment Co.*, 35 B.R. 315, 317 (Bankr.N.D.Ohio 1983); and *In re Liberal Market, Inc.*, 14 B.R. 685, 688 (Bankr.S.D. Ohio 1981). However, other courts have had no difficulty in allowing a Committee to maintain such an action in its own name. *See In re STN Enterprises, Inc.*, 73 B.R.

470, 490 (Bankr.D.Vt.1987); *In re Monument Record Corp.*, 71 B.R. 853, 863 (Bankr.M.D.Tenn.1987); *In re Four Seasons Sporting Goods, Inc.*, 46 B.R. 528, 531 (Bankr.N.D.Cal.1985); *In re Philadelphia Light Supply Co.*, 39 B.R. 51, 52 (Bankr.E.D.Pa.1984) (per GOLDHABER, CH.J.); *In re Chemical Separations Corp.*, 32 B.R. 816–19 (Bankr.E.D.Tenn. 1983); *In re Gander Mountain, Inc.*, 29 B.R. 260, 263 (Bankr.E.D.Wis.1983); *In re Joyanna Holitogs*, 21 B.R. 323, 326 (Bankr. S.D.N.Y.1982); and *In re Monsour Medical Center*, 5 B.R. 715, 719 (Bankr.W.D.Pa. 1980). We see no reason why a Committee, which is a party-in-interest, clearly entitled to intervene in its own name, should be prevented from bringing suit in its own name, if it so chooses.

We note that many of the cases in this area speculate at some length as to why the DIP may not wish to institute an action, suggesting that such a finding of a good reason for not doing so is a necessary condition to allow a Committee to proceed on behalf of a reluctant DIP. *See, e.g., In re Parrot Packing Co.*, 42 B.R. 323, 330 (N.D.Ind.1983) (DIP refused to reject collective bargaining agreement to avoid unfair labor practice charge); *Philadelphia Light, supra,* 39 B.R. at 52 (DIP failed to pursue its own president and sole .shareholder); *Toledo Equipment*, 35 B.R. at 319 (DIP wished to maintain good relationship with creditor); and *Chemical Separations, supra,* 32 B.R. at 819 (DIP did not wish to sue its own principal stockholder).

The instant case brings to mind most clearly the circumstances of *Philadelphia Light*, a decision by our prestigious former Chief Judge, Emil F. Goldhaber, and *Chemical Separations*, because the reluctance of the DIP here to sue obviously had arisen from its close relationship with its parent and other related entities who would be defendants. However, we must confess that we do not think that the reasons why a DIP has failed to proceed are really very important, or that a Committee must undertake to prove the existence of any such reason to be allowed to proceed with an action in its own name on the DIP's behalf. Rather, we believe that, upon proving the

potential merit of its case and the DIP's failure to proceed, the Committee should be allowed to proceed on its own without establishing anything further.

Inherent conflicts in the DIP's relationship with its ownership and creditors may constitute more than a cause for allowing a Committee to sue in its name, but may also constitute a basis for the appointment of a trustee in a Chapter 11 case. A trustee may, of course, prosecute the action which the DIP refused to initiate. However, allowing a Committee to maintain an action on behalf of a DIP is less drastic and hence we believe initially preferable course to that of requiring appointment of a trustee simply to prosecute a meritorious cause of action which the DIP chooses not to pursue.

■ Having established the clear right of the Committee here to maintain the proposed action against the DIP's parent, NuNic, in its own name, as per its proposed complaint, had the DIP persisted in refusing to bring such an action, we must now determine the impact of the DIP's filing of a suit of its own against NuNic and N.T. Realty Co., at Adv. No. 87–0999S, in the face of the Committee's motion. The Committee argues, with some logical force, that the DIP's very reluctance to act reveals its inability to maintain this action vigorously against its own parent and related entity.

Two cases have considered a scenario where a DIP commenced litigation only in the face of a threatened Committee action, similar to that presented here, *In re Storage Technology Corp.*, 55 B.R. 479, 485 (Bankr.D.Colo.1985); and *In re Wesco Products Co.*, 22 B.R. 107, 109–10 (Bankr. N.D.Ill.1982). While we are reluctant to follow *Storage Technology* on this point, because the court there was obviously irritated by the overabundance of litigation before it, the *Wesco Products* case is worthy of greater attention, because the court there apparently would have allowed the Committee to proceed but for the DIP's somewhat belated filing of its own action. Ultimately, the *Wesco Products* court bas-

es its decision on the conclusion that the Committee "presented no reasonable argument or argument or evidence as to why the debtor in possession would not pursue its action against the defendants as diligently as the Creditors' Committee would or could." 22 B.R. at 109. Certainly, the instant case, where this Court is convinced as a result of the veritable shrieks from the Committee that the DIP is not necessarily to be trusted to pursue this litigation on its own, we must conclude that the DIP's efforts would be unlikely to match the vigor of those of the Committee.

On the other hand, it is difficult to understand how this Court could simultaneously allow two cases to proceed on virtually the same causes of action against the same parties defendant, one in the name of the DIP, who properly has a direct cause of action, and the other on behalf of the Committee whose cause of action is clearly derivative from the rights of the DIP. We cannot and will not assume that the action of the DIP is a sham and that its counsel will necessarily fail to undertake the DIP's fiduciary duty to pursue the defendants in their lawsuit vigorously at this stage, when the action has hardly begun.

Also, per the directives of *Marin Motor* and *Hanover Industrial, supra,* we note that the Committee is entitled to intervene as a party plaintiff as a matter of right in the DIP's action. We have every reason to believe that the Committee will be able to serve as a watchdog in the role of an intervening plaintiff and show its own teeth if the DIP refuses to bite the hand of the defendants that it allegedly generously fed in the past. Therefore, unless and until we are proven incorrect in our assumption that the Committee can perform its traditional watchdog function in the traditional manner, we will keep the Committee leashed to the DIP's action. We therefore decide that, solely because the DIP has instituted suit against the targets of the Committee's Motion, that Motion must be denied. This is of course without prejudice to the Committee to intervene in the DIP's action or to attempt to file an independent action if the DIP's suit is delayed or in

some way rendered less than totally effective.

We now pass on the second Motion at hand. This is the Debtor's motion to extend the 120–day period in which it exclusively may file a plan, 11 U.S.C. § 1121(b), and the 180–day period in which it exclusively may solicit acceptances of a plan, 11 U.S.C. § 1121(c)(3), substantively based upon 11 U.S.C. § 1121(d), providing as follows:

> (d) On request of a party in interest made within the respective periods specified in subsections (b) and (c) of this section and after notice and a hearing, the court may for cause reduce or increase the 120–day period or the 180–day period referred to in this section.

In *In re Cann & Saul Steel Co.,* 76 B.R. 479, 486–88 (Bankr.E.D.Pa.1987), we indicated our commitment to giving § 1121(d) motions the general reception which the court in *In re Timbers of Inwood Forest Associates, Ltd.,* 808 F.2d 363, 370–72 (5th Cir.1987) (en banc), suggests we should. Thus, since we joined the *Timbers* court in rejecting the reasoning of *In re American Mariner Industries, Inc.,* 734 F.2d 426 (9th Cir.1984), *see also In re Grant Broadcasting of Philadelphia, Inc.,* 71 B.R. 376, 388–89 (Bankr.E.D.Pa.1987), *aff'd,* 75 B.R. 819 (E.D.Pa.1987), that undersecured creditors are necessarily entitled to compensation for delay in order that their rights be "adequately protected" for purposes of 11 U.S.C. §§ 362(d)(1), 361, we also joined the *Timbers* court in rebutting the argument that this holding would unduly prejudice undersecured creditors by unreasonably delaying enforcement of their rights by holding that we would "give meaning" to 11 U.S.C. § 1121(d) and did not "intend to liberally grant repeated 1121(d) Motions." 76 B.R. at 487.

We therefore totally agree with the reasoning of the court in *In re Lake in the Woods,* 10 B.R. 338, 342–46 (E.D.Mich. 1981); and of our brother, Judge Fox, in *In re Pine Run Trust, Inc.,* 67 B.R. 432, 434–35 (Bankr.E.D.Pa.1986), that an extension of the time-periods set forth in 11 U.S.C. § 1121(d) is not to be granted unless the

debtor moving for such an extension makes a *showing* of *cause* therefor.

■ We note that several decisions of former Chief Judge Goldhaber of this court suggest that § 1121(d) should be read very strictly. In *In re Westgate General Partnership,* 55 B.R. 562 (Bankr.E.D.Pa.1985), he read § 1121(c) as prohibiting a debtor from requesting any extension of the exclusivity periods after the initial respective 120–day and 180–day periods had run. Earlier, in *In re Trainer's, Inc.,* 17 B.R. 246 (Bankr.E.D.Pa.1982), Judge Goldhaber had held that a failure to obtain an extension of the 180–day period for accepting a plan terminated the exclusivity period, even where an extension of the 120–day period for filing a plan was warranted. These decisions appear harsh, and they have been questioned elsewhere. *See In re Perkins,* 71 B.R. 294, 196–97 (W.D.Tenn.1987) (rejects reasoning of *Westgate* ); and *In re United Press International, Inc.,* 60 B.R. 265, 267–69 (Bankr.D.D.C.1986) (rejects reasoning of *Trainer's* ). We must observe that we would be disinclined to follow *Westgate,* as its holding would prohibit *any* but an initial request for the extension of the exclusivity periods in any circumstances. Judge Fox implicitly rejected this reasoning by allowing a second extension of the exclusivity period in *Pine Run,* and our statement that we would not "liberally grant repeated" exclusivity requests in *Cann & Saul* permits the inference that we did not rule out the possibility of repeated exclusivity-period extension requests in certain circumstances. However, *Westgate* and *Trainer's* are significant in expressing this court's historic reluctance to read § 1121(d) broadly.

In its Answer to the Motion, the Debtor states that "since the Committee failed to obtain an order extending the time periods prior to the expiration of said periods, the Debtor's right to obtain an extension of the time periods has terminated." Creditors' Committee's Objection to Debtor's Motion to Extend Time Within Which Debtor Has Exclusive Right to File Plan of Reorganization and to Gain Acceptance of Plan, ¶ 3. We disagree with such a reading of 11

U.S.C. § 1121(d). In fact, the statutory requirement is that a *request* for an extension be made within the prevailing exclusivity period, not that the request be *granted* in such a period. This conclusion, combined with our rejection of the reasoning of *Westgate,* causes us to conclude that, as long as a request for extensions for the exclusivity periods is made by a motion filed, listed, and decided before the exclusivity periods expire, the motion is timely.

Of course, if the motion is not granted before the original 120–day period has expired and no stay is issued, other creditors can proceed to file a plan of their own. If the 180–day period has expired and no stay has issued, other creditors can proceed to seek acceptances of their plan, possibly rendering the decision on a debtor's motion to extend exclusivity moot. Here, the Committee has not proffered any proposed plan, nor filed same. The exclusivity period to obtain acceptances does not expire until January 13, 1988. We have kept this date in mind in scheduling a further hearing on this issue, and remind the Debtor that if no final decision is rendered on its motion and no stay is granted on its motion as of January 13, 1988, the Committee or any other creditor can not only file, but proceed to seek to obtain acceptances of, a plan of its own.

Implicit in the holding of *Lake in the Woods* and explicit in the language of *Pine Run* is the notion that "[s]ince it is the debtors who seek the extension, the burden is upon them to demonstrate the existence of good cause." 67 B.R. at 434. *See also, e.g., In re Sharon Steel Corp.,* 78 B.R. 762, 765 (Bankr.W.D.Pa.1987); and *In re Tony Downs Food Co.,* 34 B.R. 405, 407 (Bankr. D.Minn.1983). The circumstances which constitute "good cause" have not been defined narrowly, but the "traditional ground [is] the large size of the debtor and the concomitant difficulty in formulating a plan of reorganization, ..." *Id.* at 435. *See In re Texaco, Inc.,* 76 B.R. 322, 326–27 (Bankr. S.D.N.Y.1987); 5 COLLIER ON BANKRUPTCY, ¶ 1121.04, at 1121–13 (15th ed. 1987). As is emphasized in *Pine Run* and *In re Swatara Coal Co.,* 49 B.R. 398 (Bankr.E.D.Pa.1985) (per TWARDOWSKI,

CH.J.), a debtor's showing of progress in formulating a plan in the face of creditor recalcitrance or unusual procedural or substantive difficulties or developments in the case may also establish the requisite "good cause" for extension of the exclusivity periods.

■ The evidentiary burdens of a debtor seeking an extension of the exclusivity periods is best fleshed out in *In re Ravenna Industries, Inc.*, 20 B.R. 886 (Bankr.N. D.Ohio 1982). There, the court holds, *id.* at 889, that "mere recitations of allegations deemed by a debtor to constitute cause for an extension of the exclusivity period is insufficient to allow such an extension." Rather, submission of *evidence* to support the allegations of cause is a prerequisite. *Id.* The above-quoted passage in *Ravenna* is similarly quoted with approval in *In re Parker Street Florist & Garden Center, Inc.*, 31 B.R. 206, 207 (Bankr.D.Mass.1983), and *Ravenna* is cited with approval by Judge Bentz in *Sharon Steel*, 78 B.R. at 765, and Judge Fox in *Pine Run*, 67 B.R. at 434.

■ Our embrace of the reasoning of *Ravenna* compels us to consider the final legal issue raised by the presenting motions, i.e., whether and in what circumstances a bankruptcy court should incorporate pleadings and evidence adduced in presentation or litigation of other matters in the same (or other) cases as part of the record in a matter before it. Resolution of this issue requires us to carefully analyze the decision in one of the few classic bankruptcy evidentiary decisions, *In re Aughenbaugh*, 125 F.2d 887 (3d Cir.1942), penned by venerable (and still active) Senior Circuit Judge Albert B. Maris almost forty-six years ago.

In that case, a bankruptcy referee based his determination of a significant issue in the matter at hand, e.g., insolvency, on matters culled from the record file of the bankruptcy case, but not presented at the hearing on the instant motion. Judge Maris held as follows:

In passing upon this question [of insolvency] we may consider only the evidence which was presented to the referee at the hearing upon the trustee's exceptions to the mortgagee's priority claim. We may not consider other evidence which may have been in the files of the referee in the bankruptcy administration proceeding. To hold otherwise would be to violate the fundamental concept of procedural due process that a party to litigation is entitled to have the evidence relied on by his opponent presented at the hearing of his case or that he may have opportunity to cross-examine his opponent's witnesses and to offer evidence in rebuttal. . . .

. . . If the trustee desired to rely upon any papers already on file in the bankruptcy proceeding it was incumbent upon him to offer them at the hearing of his exceptions in order that the mortgagee might know that they were being relied upon and might have an opportunity to meet them with such other evidence as might be available to it. *Id.* at 889.

Decisions of this court interpreting *Aughenbaugh* have revealed a love-hate relationship. When the court wished to invoke it, it was there as a trusty nail on the coffin of an unappealing motion. *See In re Key*, 58 B.R. 59, 60 (Bankr.E.D.Pa.1986); and *In re Ratmansky*, 7 B.R. 829, 832 (Bankr.E.D. Pa.1980). However, when this court wished to reach a result which evidence not presented at the hearing revealed was unappealing, it was rather handily cast aside upon "considerations of expediency and justice." *In re Eagson Corp.*, 37 B.R. 471, 479–80 (Bankr.E.D.Pa.1984), quoting *Funk v. CIR*, 163 F.2d 796, 801 (3d Cir. 1947).

The Debtor here acknowledges *Aughenbaugh's* presence, but argues that it does not apply because, here, the Debtor *did* move the contents of the pleadings incorporated, which happened to be "only" the entire case file, into evidence at the hearing, and, in *Aughenbaugh*, the documents relied upon by the referee were never offered at the hearing.

The Debtor presents a plausible, but very narrow, reading of *Aughenbaugh*, i.e., that a mere offering of contents of the case cures the due process deficiencies noted

therein. We believe that this reading is out of step with the underlying practicalities and due process implications expressed in *Aughenbaugh.* Advising the Committee that it was offering the entire file, containing over one hundred documents, without any selectivity, on the very date of the hearing, appears to us to very clearly deprived the Committee of "an opportunity to meet" such a mass of evidence with contrary evidence which the Committee might have attempted to garner had it known with some specificity what the Debtor was asserting in its support.

Our only extended consideration of *Aughenbaugh* was in the course of our Opinion in *In re Chandler,* 77 B.R. 513, 520 (Bankr.E.D.Pa.1987). There, we declined the offer of counsel for a lienholder opposing a motion pursuant to 11 U.S.C. § 522(f)(1) to judicially notice the recording of a junior mortgage despite the offer that same be admitted in the course of the hearing. Although recognizing that we have some discretion to take judicial notice of proceedings in other courts as well as our own court, we held as follows:

> Our policy is to refuse to judicially notice proceedings in any other matter, including those of our own court, unless the opposing party has been fully apprised of same a reasonable time prior to the hearing or agrees to same, to overcome the due process issue raised in *In re Aughenbaugh,* 125 F.2d 887, 889 (3d Cir. 1942); or unless the proceedings are introduced by appropriate formal evidence. In the instant case, [the lienholder] merely sought to add certain documents to the record, over the objection of the Debtors' counsel, with no indication that he had apprised the Debtors' counsel previously of his intention to offer them and no attempt to formally introduce same, per F.R.Ev. 1005. Thus, they were properly excluded.[1]

Here, the Debtor made no formal attempt to introduce the really relevant materials in the record. We also are unaware of any pre-trial effort by the Debtor's counsel to apprise the Committee's counsel as to what record documents were to be relied upon, thus depriving the Committee of any real opportunity to present evidence to rebut the contents of matters in the record deemed pertinent to the motion. Although a few contents of the record well-known to the Committee may have been admitted without question, the Debtor here attempted to bring in the entire huge case record. Only where written notice of those specific portions of the record to be relied upon by counsel prior to a hearing are provided to opposing counsel at least a week prior to the hearing on the matter at issue, would we be inclined to accept a significant portion of matters generated in the same case, or other of our cases, or records of courts elsewhere, into the record. Furthermore, if records from a court other than our own are sought to be admitted, and are not in the possession of opposing counsel, copies should be supplied to opposing counsel with the notice. Then, and only then, do we believe that the fundamental due process issues in *Aughenbaugh* are satisfactorily addressed, as then opposing counsel will have adequate time to obtain evidence to rebut that allegedly provided by the record.

In the context of this case, it was not helpful in the least to opposing counsel to be apprised that the Debtor wished the court to consider "the whole file." If a party wants to be assured that the court will admit its records into evidence, then that party should take the responsibility to carefully designate precisely upon which file contents, by document and specific page and paragraph in the document, reliance will be sought. Reasonable selectivity must, therefore, be required.

---

1. We acknowledge that we made an exception to this holding in *In re Samuel,* 77 B.R. 520, 521–22 (Bankr.E.D.Pa.1987), where the Debtor's counsel displayed a distinct lack of diligence to his opponent's offer of the contents of records of other filings of the Debtor in this court.

However, noting that we nevertheless ruled in favor of the Debtor on the merits there, assuming *arguendo* the admission of the contents of the other case records, such exceptions are extremely rare.

In the instant case, the Debtor, to our knowledge, provided no prior notice to the Committee that its tactics would be to introduce and rely upon the entire record at the hearing. Thus, the Committee had no chance to know what portions of the record contained the Debtor's evidentiary basis for its motion and it could not reasonably prepare a defense. Therefore, we decline the Committee's offer that we can consider the contents of the entire record as the evidence necessary to support the Debtor's motion to extend its exclusivity periods.

However, we must realistically recognize that this is a complex case, and the incipient presence of the future claimants promises to make it considerably more complex. In the case of *In re UNR Industries, Inc.*, 72 B.R. 789 (Bankr.N.D.Ill.1987), involving debtors faced with 17,000 asbestos-related tort claims, the court, in deference to the size and complexity of the case, accorded the Debtors a second 60–day exclusivity extension, over vigorous Committee opposition. The court did, however, also appoint an examiner *sua sponte*, principally to investigate whether the Debtors were making good-faith efforts and progress towards reorganization. An appointment of such an officer is a point to ponder here, since allegations of "fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor," 11 U.S.C. § 1104(b), are beginning to surface.

Therefore, we shall not deny the Debtor's exclusivity motion, but shall schedule a further hearing to determine it. We shall schedule the hearing on January 12, 1988, prior to the January 13, 1988, date that the period in which the Debtor exclusively may solicit acceptances of a plan expires. We shall also direct that, on or before December 31, 1987, the Debtor supply a list of the documents in this record which it wishes to place in the record on this motion, with appropriate paragraph and page references, to all of the interested counsel listed as recipients of this Opinion, and the Court. In that way, the due process rights of all parties wishing to oppose the Debtor's motion will be protected.

An Order consistent with the conclusions expressed in this Opinion shall be entered.

### ORDER

AND NOW, this 24th day of December, 1987, after a hearing of November 18, 1987, on the Motion of the Official Unsecured Creditors' Committee for Leave to Commence Suit on Behalf of Nicolet, Inc. to recover Monies Misappropriated From the Debtor, Fraudulent Conveyances, Preferential Transfers, and to Pursue Injunctive Relief against NuNic, Inc. (hereinafter referred to as "the Committee's Motion"), and the Briefs of the parties addressing same, and after a hearing of December 10, 1987, on the Motion of the Debtor to Extend Time Within Which Debtor Has Exclusive Right to File Plan of Reorganization and Gain Acceptance of Plan (hereinafter referred to as "the Debtor's Motion"), and the Briefs addressing same, it is hereby ORDERED AND DECREED as follows:

1. The Committee's Motion is DENIED without prejudice to pursue any motions related to participation in and oversight of Adv. No. 87–0999S, as discussed in the foregoing Opinion.

2. Disposition of the Debtor's Motion is stayed pending a further hearing scheduled on

TUESDAY, JANUARY 12, 1988, at 10:00 A.M. in Courtroom No. 2 (Room .3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

3. On or before December 31, 1987, the Debtor shall provide to all counsel listed as recipients of this Opinion and to the Court, a list of precisely what pleadings in this case it relies upon in making its record in this case, with references to paragraphs, exhibits, and page numbers, where appropriate. The copy to the Court shall be delivered in chambers to the following address: