POSNER, Circuit Judge.
 

 The district court in a bankruptcy proceeding refused to appoint a representative to file claims on behalf of individuals who may develop asbestosis or other lung diseases in the future from past exposure to asbestos manufactured and sold by the bankrupt, 29 Bkrtcy. 741 (N.D.I11.1983), and the bankrupt has appealed. The first and last issue we consider is the appealability of the judge’s order.
 

 In 1982 a group of affiliated corporations (collectively, UNR) petitioned under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101
 
 et seq.
 
 The ground for the petition (as for Johns-Manville’s, pending in the Southern District of New York, and Ama-tex’s, pending in the Eastern District of Pennsylvania) is that UNR cannot satisfy its enormous tort liability, actual and potential, resulting from the thousands of asbestosis suits that have been or will be brought against it by shipyard workers and others who have inhaled fibers from asbestos that it manufactured. See Note,
 
 The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings,
 
 96 Harv.L.Rev. 1121 (1983); Special Project,
 
 An Analysis of the Legal, Social, and Political Issues Raised by Asbestos Litigation,
 
 36 Vand.L. Rev. 573, 806-07, 845 (1983); Note,
 
 Manville: Good Faith Reorganization or “Insulated" Bankruptcy,
 
 12 Hofstra L.Rev. 121 (1983). Although UNR represents that it stopped manufacturing asbestos in 1970, some of its asbestos remained (and no doubt remains to this day) in shipyards and other places where people are exposed to airborne asbestos fibers; and in any event it is sometimes not until many years after last inhaling the fibers that one develops a diagnosable case of asbestosis (a term we use broadly to refer to any asbestos-related disease). Already a defendant in more than 17,000 asbestosis suits, UNR expects to be sued by 30,000 to 120,000 new asbestosis victims as their disease manifests itself and is diagnosed. Compare Walker et al.,
 
 Projections of Asbestos-Related Disease 1980-2009,
 
 25 J. Occupational Med. 409 (1983).
 

 Believing that its ability to formulate a workable plan of reorganization might depend on its being able somehow to remove the enormous cloud of potential tort liability represented by the prospective suits, UNR in October 1982 filed in the bankruptcy court an “Application for the Appointment of a Legal Representative for Unknown Putative Asbestos-Related Claimants.” UNR’s hope was that if such a representative were appointed, he might, under the supervision of the bankruptcy court, negotiate with UNR some arrangement whereby all potential asbestosis claims could be fixed and discharged in the final plan of reorganization, along with the claims of UNR’s existing asbestosis and other tort and contract creditors. See Note,
 
 Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common-Law Tort System,
 
 61 Tex.L.Rev. 1297, 1314 (1983). UNR might set up a
 
 *1114
 
 revolving fund out of which the representative would pay possible future plaintiffs a fraction of their tort claims as they accrued, or it might purchase annuities for them. And it then could operate free of the threat to solvency posed by the prospective claims.
 

 At about the same time that UNR’s application was filed, the Supreme Court handed down its decision in
 
 Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,
 
 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), invalidating the provision of the Bankruptcy Reform Act of 1978, Pub.L. 95-598, that vests the exercise of the district courts’ bankruptcy jurisdiction in bankruptcy judges who do not enjoy the guarantees of judicial independence in Article III of the Constitution. Interpreting the Supreme Court’s decision as invalidating only the subsection of the new Act that provides, “The bankruptcy court ... shall exercise all of the jurisdiction conferred by this section on the district courts,” 28 U.S.C. § 1471(c), and not the preceding subsections, 28 U.S.C. §§ 1471(a) and (b), which vest original jurisdiction over bankruptcy in the district courts, the United States District Court for the Northern District of Illinois, by direction of the Seventh Circuit Judicial Council acting pursuant to 28 U.S.C. § 332(d)(1), adopted on December 20, 1982, as a General Order, a proposed rule drafted by the Judicial Conference of the United States under authority of 28 U.S.C. § 331. The rule, so far as it bears on this case, allows the district court to hear any part of a bankruptcy case. (The rule is printed in 1 Collier on Bankruptcy, insert preceding ch. 3 (15th ed. 1983). The background of the rule is described, and its validity defended, in
 
 White Motor Corp. v. Citibank, N.A.,
 
 704 F.2d 254, 259-62 (6th Cir.1983).) It was pursuant to the General Order that Judge Hart considered and denied UNR’s application to appoint a representative. His ground for denial was that people who have not yet developed asbestosis do not have claims that can be proved in bankruptcy. See 11 U.S.C. § 101(4)(A).
 

 If this appeal had been filed before the passage of the Bankruptcy Reform Act of 1978, there would be no doubt about appealability; for section 24(a) of the previous Bankruptcy Act, 11 U.S.C. § 47(a) (1976 ed.), with qualifications not material to this case, explicitly allowed appeals to be taken from interlocutory bankruptcy orders of district judges to the courts of appeals. See 1 Collier on Bankruptcy,
 
 supra,
 
 ¶ 3.03[7][b] at pp. 3-289 to 290. But the 1978 Act repealed section 24(a) in regard to proceedings, such as this Chapter 11 proceeding, begun after October 1, 1979. Bankruptcy Reform Act of 1978, Pub.L. 95-598, Title IV, §§ 401(a), 402(a), 403(a), 92 Stat. 2549, 2682-83. It also created a new system of appellate review of bankruptcy orders. This system involves three routes for appealing
 
 final
 
 orders of bankruptcy judges: to panels consisting of three bankruptcy judges; to the district court, in districts where no such panels are created; and directly to the court of appeals, if the parties agree. See 28 U.S.C. §§ 160(a), 1293(b), 1334(a), 1482(a). An
 
 interlocutory
 
 order of a bankruptcy judge may also be appealed— to a panel of three bankruptcy judges or to the district court, as the case may be — but only with leave of the panel or court. See 28 U.S.C. §§ 1334(b), 1482(b). The new system of appellate review of bankruptcy orders is not to be fully effective, however, till April 1, 1984. Until then, during the “transition period” as it is called, “the jurisdiction of the district courts, the courts of appeals, and panels of bankruptcy judges to hear appeals shall be the same as the jurisdiction of such courts and panels granted under the amendments [that the new Act makes to the Judicial Code, see 28 U.S.C. §§ 1293, 1334, 1482] to hear appeals from the judgments, orders, and decrees of the bankruptcy courts .... ” Bankruptcy Reform Act of 1978, Pub.L. 95-598, Title IV, § 405(c)(2), 92 Stat. 2685. The appeal in this case was taken during the transition period.
 

 A threshold question is whether Judge Hart, in denying UNR’s application, was acting as a bankruptcy judge or as a district judge. If the former, his order, even if final, could be appealed to us only
 
 *1115
 
 with the consent of the parties, and some of the parties have not consented. But it is evident that the General Order does not make district judges bankruptcy judges but rather shifts some of the bankruptcy judges’ jurisdiction back to the district judges, pursuant to the grant of jurisdiction to the district courts in 28 U.S.C. §§ 1471(a) and (b). Cf.
 
 Coastal Steel Corp.
 
 v.
 
 Tilghman Wheelabrator Ltd.,
 
 709 F.2d 190, 199-200 (3d Cir.1983). Any other interpretation would make no sense from the standpoint of creating an orderly system of appellate review. During the transition period as afterward, orders of bankruptcy judges can be appealed only to a bankruptcy panel or the district court, unless the parties agree to come to this court. It would be weird to have an order of a district judge appealed to a panel of bankruptcy judges — quite apart from constitutional objections based on the
 
 Marathon
 
 decision — or to another district judge; and there is no provision, statutory or otherwise, for having a district judge’s order reviewed by a panel of district judges.
 

 The validity of the General Order revesting original bankruptcy jurisdiction in district judges is supported by decisions in several circuits. See
 
 Gold v. Johns-Manville Sales Corp.,
 
 723 F.2d 1068, 1075 (3d Cir. 1983);
 
 Kaiser v. Salomon,
 
 722 F.2d 1574 at 1578 (2d Cir.1983);
 
 White Motor Corp. v. Citibank, N.A., supra,
 
 704 F.2d at 262-64;
 
 In re Hansen,
 
 702 F.2d 728, 729 (8th Cir.1983) (per curiam);
 
 In re Braniff Airways, Inc.,
 
 700 F.2d 214, 215 (5th Cir.1983) (per curiam); but see Countryman,
 
 Emergency Rule Compounds Emergency,
 
 57 Am.Bankr. L.J. 1 (1983). Although this court has not yet considered the validity of the General Order in an adjudicative setting, we must determine our own jurisdiction to review the district judge’s order before we can decide his jurisdiction to issue it; and for the limited purpose of determining whether the district judge’s order is appealable, we need only decide whether the General Order vests jurisdiction in the district judges as district judges. And clearly it does that.
 

 The next question is how a bankruptcy order issued by a district judge is appealed during the transition period. The only provision in the new Bankruptcy Act relating to appeals from district courts to courts of appeals, 28 U.S.C. § 1293(b), makes “a final judgment, order, or decree of ... a District Court” appealable to the court of appeals. But there is a question whether this provision operates during the transition period. As noted earlier, section 405(c)(2) of the new Act gives the courts of appeals during this period the same jurisdiction as is conferred on them for the subsequent period by specified provisions of the Bankruptcy Reform Act — including the provision that creates 28 U.S.C. § 1293(b) — “to hear appeals from the judgments, orders, and decrees of the bankruptcy courts .... ” But we do not have a judgment, order, or decree of the bankruptcy court, but of the district court. Such an analysis led the Tenth Circuit, in
 
 In re Glover, Inc.,
 
 697 F.2d 907, 909 (10th Cir.1983) (per curiam), to hold that section 1293(b) does not operate during the transition period.
 

 Although there is contrary authority in the Third Circuit, see
 
 In re Marin Motor Oil, Inc.,
 
 689 F.2d 445, 447-48 (3d Cir.1982);
 
 Universal Minerals, Inc. v. C.A. Hughes & Co.,
 
 669 F.2d 98, 101 (3d Cir.1981), it hardly matters which circuit is right. If section 1293(b) is not applicable during the transition period, then section 1291 is, and the two sections are materially the same. Section 1291 allows appeals to the courts of appeals from “final decisions” of the district courts, and “decision” in section 1291 means judgment, order, or decree. (See 15 Wright, Miller & Cooper, Federal Practice and Procedure § 3906 at p. 427 (1976), on “judgment” and “decree”; as for “order,” the very name of the “collateral order” doctrine — a doctrine of interpretation of section 1291, as we shall see later in this opinion — is revealing.) And while “finality,” interpreted functionally, might mean something different in a bankruptcy case from what it does in other cases, section 1291 is flexible enough to be applied differently depending on circumstances. Cf.
 
 Cohen v. Beneficial Industrial Loan
 
 
 *1116
 

 Corp.,
 
 337 U.S. 541, 546, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528 (1949);
 
 In re Saco Local Development Corp.,
 
 711 F.2d 441, 444 (1st Cir.1983). Perhaps radically differently, in some circumstances: the
 
 Marin
 
 case held that a district judge’s order allowing intervention in a bankruptcy case — an order that would not have been final in any other kind of case — was final and appealable, because there was nothing further to be done by the district judge, whose function in the case was a purely appellate one. See 689 F.2d at 447-49. The court of appeals suggested that its result might have been different if section 1291 rather than (as it thought, contrary to the Tenth Circuit’s view in Glover) section 1293(b) had been controlling. But it is not the difference between the statutes— their language is materially the same as we have said — but the difference of circumstances that best explains the result in Marin. In any event, our case is not at all like that, and we need not decide therefore whether we agree or disagree with the Third Circuit’s approach.
 

 We come at last to the heart of the appealability issue, which is whether Judge Hart’s order was “final.” There is an obvious sense in which it was not. It did not wind up the litigation before the district court; the bankruptcy reorganization goes on. But lack of finality in this sense is not fatal to the appeal. Orders disposing of claims filed against the bankrupt estate while the bankruptcy proceeding is pending are much more like final judgments in ordinary civil suits than like interlocutory orders in such suits. See, e.g.,
 
 In re Bestmann,
 
 720 F.2d 484, 486 (8th Cir.1983). If an asbestosis victim sues a solvent manufacturer of asbestos and the court dismisses the complaint, the dismissal is, of course, a final judgment. Under the former bankruptcy procedure, an asbestosis victim usually would sue a bankrupt asbestos manufacturer in just the same way; if he won he would file his judgment as a claim against the bankrupt in the bankruptcy proceeding, see 11 U.S.C. § 103(a)(1) (1976 ed.); and if the claim was denied he could appeal the denial. See
 
 In re Saco Local Development Corp., supra,
 
 711 F.2d at 444-45. But this was a cumbersome procedure, and a major change brought about by the Bankruptcy Reform Act of 1978 was to authorize the bankruptcy court to adjudicate claimants’ rights under tort law, thus merging the tort determination with the claim determination. See H.R.Rep. No. 595, 95th Cong., 1st Sess. 445 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 18, 153 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787;
 
 Northern Pipeline Construction Co. v. Marathon Pipe Line Co., supra,
 
 102 S.Ct. at 2862-63. (This expansion in the bankruptcy courts’ power was a major reason why the Supreme Court held in
 
 Marathon
 
 that the new bankruptcy judges created by the Act were exercising powers reserved to Article III judges, and why in turn the General Order revested the bankruptcy judges’ powers in the district judges.) When a claim is denied under the new procedure created by the Act, it is even clearer than under the former procedure that the denial is the equivalent of a final tort judgment and is therefore appealable consistently with conventional principles of finality.
 

 UNR argues that in refusing to appoint the representative the district judge in effect denied the claims that the representative would have presented; and if this is right, the refusal would be appeal-able, as we have just seen. But we do not think it is right. Although the judge refused to make the appointment because he believed that such claims would have no status in bankruptcy, you cannot appeal from the implications of what a judge does as distinct from the actual order he enters. If a judge denied a plaintiff’s request for a discovery order because he believed the plaintiff’s case had no merit, the plaintiff could not appeal from that order; he would have to wait till the district judge dismissed the complaint. It is the same here. By denying the appointment of a representative on the ground he did the district judge telegraphed his punch; it is now highly predictable that when and if someone who has been exposed to asbestos manufactured by UNR but has not yet developed a diagnosable case of asbestosis files a claim
 
 *1117
 
 against UNR in this bankruptcy proceeding the judge will deny the claim. But he has not done so yet.
 

 Nor are we persuaded that his action is tantamount to denial because if no representative is appointed no member of the class sought to be represented will realize that he may have a claim and attempt to file it. Of the 30,000 to 120,000 people who UNR thinks may one day contract asbestosis and sue UNR for the damages resulting from their disease, some must already be aware that they may be ticking time bombs, and the very active plaintiffs’ asbestosis bar will surely bend every effort to make the others aware. As a matter of fact a man named Robinson, who says he was exposed to asbestos sold by UNR but has not yet developed asbestosis, moved to intervene in the district court to oppose UNR’s application for appointment of the representative. Robinson’s motion was denied and he has not filed an appeal from the denial. His motion was not an attempt to file a claim and the denial of the motion was not the denial of a claim, but the motion shows that at least one member of the class of possible future asbestosis victims is aware of his situation and prepared to litigate in reference to it.
 

 As we do not think the district judge’s order has the effect of denying the claims of such victims, it is not a final order in a conventional bankruptcy sense, and is ap-pealable if at all only under the “collateral order” doctrine created by the Supreme Court in
 
 Cohen v. Beneficial Industrial Loan Corp., supra.
 
 This doctrine allows orders that are not final in the sense of disposing of the entire lawsuit before the district court, but are final in the sense of irrevocably deciding the rights of a party, to be appealed under 28 U.S.C. § 1291. The order appealed in
 
 Cohen
 
 denied a motion to require the plaintiff to post an indemnity bond guaranteeing reimbursement of the defendant’s cost of the action if the plaintiff lost. The Supreme Court held that the order “appears to fall in that small class which finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.” 337 U.S. at 546, 69 S.Ct. at 1225. The rationale is similar to that of 28 U.S.C. § 1292(a)(1), which allows appeals from orders granting or denying preliminary injunctions. See 337 U.S. at 545, 69 S.Ct. at 1225. An order at the end of the litigation requiring the plaintiff to post a bond would come too late to help the defendant. Either the plaintiff would have the resources to reimburse the defendant or he would not, and if he did not there would be no indem-nitor to whom the defendant could look for payment. As a practical matter therefore the determination that the defendant sought to appeal would have become moot if the appeal had been postponed to the end of the district court proceeding.
 

 In contrast,
 
 United States v. Dorfman,
 
 690 F.2d 1230,1231-32 (7th Cir.1982), where criminal defendants appealed from an order unsealing wiretap transcripts, on the ground that the publication of the transcripts would invade a statutory right of privacy, did permit an appeal to be taken under the
 
 Cohen
 
 doctrine, because the defendants’ privacy would be “gone forever as soon as the media began disseminating their news stories; and it is doubtful, to put it mildly, that if the appellants ultimately convinced this court or the Supreme Court that the motion had been improperly granted, they could get any monetary redress.”
 
 Id.
 
 at 1232. But in
 
 Firestone Tire & Rubber Co.
 
 v.
 
 Risjord,
 
 449 U.S. 368, 101 S.Ct. 669, 66 L.Ed.2d 571 (1981), the Supreme Court held that an order denying a motion to disqualify counsel was not appealable, because if the denial of the motion was improper the error could be corrected on appeal from the final judgment. The Court emphasized the lack of “irreparable harm” from denial of an immediate appeal, see 449 U.S. at 376, 378 n. 13, 101 S.Ct. at 675 n. 13, thus picking up the suggestion in
 
 Cohen
 
 that the purpose of the collateral-order doctrine is closely related to that of section 1292(a)(1), which allows immediate appeal of an order granting or denying a prelimi
 
 *1118
 
 nary injunction because an erroneous such order must, virtually by definition, cause irreparable harm to one of the parties.
 

 Thus, for an order to be appealable under the
 
 Cohen
 
 doctrine its consequences for the appellant must be irreversible by subsequent proceedings.
 
 In re Continental Investment Corp.,
 
 637 F.2d 1, 5 (1st Cir. 1980). There is nothing irreversible, at least so far as the potential asbestosis plaintiffs themselves are concerned, about the district court’s order refusing to appoint someone to represent them. Any such victim is free to file a claim with the district court, and if the claim is denied to appeal the denial to us as a final decision. And he can if he wants try to file a claim on behalf not only of himself but of others who have been exposed to asbestos sold by UNR but have not yet developed a diagnosable case of asbestosis. The judicial process will benefit from waiting for an actual claim to be filed. When that happens the district court —and, if it dismisses the claim and the dismissal is appealed, the court of appeals— will have before it a concrete claim and not merely speculation about potential claimants. This will create a. more informative context for deciding whether the interests of potential victims of asbestosis can be dealt with — whether one-by-one or in gross — in this bankruptcy proceeding.
 

 True, there is much learning that mass-disaster torts in general and asbestosis cases in particular are unsuitable for class-action treatment. See, e.g.,
 
 In re Northern District of California, Daikon Shield IUD Products Liability Litigation,
 
 693 F.2d 847, 852-54 (9th Cir.1982);
 
 Yandle v. PPG Industries, Inc.,
 
 65 F.R.D. 566 (E.D.Tex.1974); Williams,
 
 Mass Tort Class Actions: Going, Going, Gone?,
 
 98 F.R.D. 323 (1983). We need not decide whether this learning would carry over to the bankruptcy context, whether it is entirely sound (a proposition questioned in Judge Williams’ article), and whether in any event it is applicable to the unusual situation presented here, where each claim, because it is an estimate of a possible future harm rather than a definite past harm, will be smaller than the usual mass-disaster tort claim and therefore more needful of class treatment. These questions, too, would be presented in a more illuminating context if we had before us an actual claimant, not merely the bankrupt raising a procedural question before an actual claim has been filed.
 

 Coopers & Lybrand v. Livesay,
 
 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), which held that orders refusing to certify suits as class actions under Rule 23 of the Federal Rules of Civil Procedure are not within the scope of the
 
 Cohen
 
 doctrine, bears directly on this case. When class certification is denied, many and sometimes all members of the class may be unable as a practical matter to get any relief against the defendant; their claims may be too small to make it worth their while to sue individually. Nevertheless the Court in
 
 Li-vesay
 
 refused to apply the
 
 Cohen
 
 doctrine and dismissed the appeal. The situation here is parallel. It may be that if no representative of potential victims of asbestosis is appointed many of those potential victims will not file claims against the bankrupt estate until too late. Yet the situation of the potential victims is actually better than that of members of a class when class certification is refused. Any member of the “class” that UNR wants a representative appointed for can, without incurring the cost of bringing an independent lawsuit, file a claim with the district court; and if the court denies his claim he can appeal immediately to us. If we decide on appeal that such claims are proper in bankruptcy the district judge will have to reexamine his refusal to appoint a representative for the potential claimants — the basis of his refusal (that the persons who would be represented have no rights in bankruptcy) having been destroyed.
 

 Since some potential claimants might be discouraged by the fact that Judge Hart, in refusing to appoint a representative for them, expressed the view that they have no rights in bankruptcy, we emphasize that the correctness of his view (criticized in Roe,
 
 Bankruptcy and Tort: The Problem of Mass Disaster,
 
 84 Colum.L.Rev. (forthcom
 
 *1119
 
 ing 1984)) is an open one in our minds. The practical difficulties of identifying, giving constitutionally adequate notice to, and attempting to estimate the damages of the thousands upon thousands of people who have been exposed to asbestos sold by UNR but have not yet developed asbestosis are formidable, and possibly insurmountable. Yet if any of them have already suffered a tort there would be no basis we can think of for not letting them file claims in this bankruptcy proceeding. And some, at least, probably have suffered a tort. The states differ on whether a cause of action in an asbestosis case accrues upon inhalation (see, e.g.,
 
 Steinhardt v. Johns-Manville Corp.,
 
 54 N.Y.2d 1008, 1010-11, 446 N.Y.S.2d 244, 246, 430 N.E.2d 1297, 1299 (1981);
 
 Braswell v. Flintkote Mines, Ltd.,
 
 723 F.2d 527 at 532-33 (7th Cir.1983)) or not until there is palpable disease (see, e.g.,
 
 Nuebauer v. Owens-Corning Fiberglas Corp.,
 
 686 F.2d 570 (7th Cir.1982)) or the disease is discovered (see, e.g.,
 
 Pauley v. Combustion Engineering, Inc.,
 
 528 F.Supp. 759, 764 (S.D.W.Va.1981)). See generally Note,
 
 supra,
 
 12 Hofstra L.Rev. at 138-39 and nn. 118-27. Even in a “discovery” state the cause of action may “exist” before it “accrues”— that is, before the statute of limitations on bringing it begins to run. See
 
 Moore v. Jackson Park Hospital,
 
 95 Ill.2d 223, 232, 69 Ill.Dec. 191, 194-95, 447 N.E.2d 408, 411-12 (1983); but see
 
 Morrissy v. Eli Lilly & Co.,
 
 76 Ill.App.3d 753, 761, 32 Ill.Dec. 30, 37, 394 N.E.2d 1369, 1376 (1979). These states postpone the date of accrual of the cause of action not in order to prevent the early filing of claims but in order to lift the bar of the statute of limitations to later filings. Since there is “medical evidence that the body incurs microscopic injury as asbestos fibers become lodged in the lungs and as the surrounding tissue reacts to the fibers thereafter,”
 
 Keene Corp. v. Insurance Co. of North America,
 
 667 F.2d 1034, 1042 (D.C. Cir.1981), and since no particular amount of injury is necessary to create tort liability, courts in these states might hold that a tort claim arises as soon as asbestos fibers are inhaled, however much time the victim might have for bringing suit. In any event, some at least of the many thousands of workers who have been exposed to asbestos sold by UNR must have been exposed in states such as Indiana and New York where the cause of action accrues upon inhalation, and their claims against the bankrupt estate — accrued tort claims — would appear uncontroversially to be provable in bankruptcy.
 

 Even in states where exposed workers are not injured in a tort sense till the disease manifests itself, and therefore do not have an accrued tort claim in any sense, and even assuming that an unaccrued tort claim cannot be a “claim” within the meaning of 11 U.S.C. § 101(4XA) (that is, a “right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured”), a bankruptcy court’s equitable powers (on which see, e.g.,
 
 Pepper v. Litton,
 
 308 U.S. 295, 304, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939); 1 Remington, A Treatise on the Bankruptcy Law of the United States § 22 (Henderson 5th ed. 1950)) just might be broad enough to enable the court to make provision for future asbestosis claims against the bankrupt when it approved the final plan of reorganization. The date on which a person exposed to asbestos happens to develop a diagnosable case of asbestosis is arbitrary. Could it not be argued therefore that a bankruptcy court can and should use its equitable powers, which traditionally “have been invoked to the end that ... substance will not give way to form, that technical considerations will not prevent substantial justice from being done,” 308 U.S. at 305, 60 S.Ct. at 244 (especially, perhaps, in a reorganization case, see
 
 In re Michigan Brewing Co.,
 
 24 F.Supp. 430 (W.D.Mich.1938)), to prevent the liquidation or discharge of the bankrupt before provision is made for such persons? And more than arbitrariness is involved. If future claims cannot be discharged before they ripen, UNR may not be able to emerge from bankruptcy with reasonable prospects for continued existence as a going concern. In that event, and assuming that UNR’s
 
 *1120
 
 going-concern value would exceed its liquidation value, both UNR (which is to say the creditors who will own UNR at the conclusion of the reorganization) and future plaintiffs would be made worse off, and UNR’s current creditors would not necessarily be made better off, by the court’s failure to act along the lines proposed by UNR.
 

 But against all this it can be argued, returning to our first point, that it would be a quixotic undertaking far beyond the realistic boundaries of judicial competence to make sufficiently generous provision for upwards of a hundred thousand unidentified claimants to justify extinguishing their claims involuntarily; that even if only a small fraction of the claims were not extinguished the cloud of potential liability over UNR’s head might still be too large for it to emerge from bankruptcy as a going concern with fair prospects of surviving in the long run; and that, as Judge Hart said, the solution to this problem must come from Congress.
 

 Fortunately we need not decide these difficult and far-reaching questions here; their very difficulty, and far-reaching nature, are reasons for our refusing to decide them prematurely through a permissive interpretation of 28 U.S.C. § 1291. We merely point out that they are substantial questions which the district court did not finally decide when it turned down the application to appoint a representative and on which the district court in any event does not have the final say.
 

 We thus far have considered the question of irreversible consequences — the key to appealability under the
 
 Cohen
 
 doctrine — from the standpoint of possible future asbestosis victims, the people for whom UNR wanted the district judge to appoint a representative, rather than from the standpoint of UNR itself, though the motive for UNR’s application was self-interest rather than altruism. It can be argued, and UNR does argue (though as a subordinate theme), that the denial of its application will, unless that denial is promptly reversed, have irreversible consequences for it; that by making it impossible for UNR to discharge potential as well as actual asbestosis claims Judge Hart has made it impossible for UNR to emerge successfully from the reorganization proceeding. But this argument confuses an interim procedural ruling with the terms of the final plan of reorganization. Cf.
 
 In re Kutner,
 
 656 F.2d 1107, 1111 (5th Cir.1981). When a final plan is approved (see 11 U.S.C. §§ 1126-1144) that makes no provision for possible future asbestosis victims, UNR will be able to appeal to us from the order adopting the plan, see, e.g.,
 
 In re Carbide Cutoff, Inc.,
 
 703 F.2d 259 (7th Cir.1983);
 
 In re Fondiller,
 
 707 F.2d 441, 442 n. 1 (9th Cir.1983), assuming it is not so hopelessly insolvent at that point that it is indifferent to the terms of the reorganization, see
 
 id.
 
 at 442. And it will be able to argue on appeal that the plan is defective because of the failure to make provision for potential asbestosis victims. If we agree and reverse, the district court will then appoint a representative or take whatever other steps may be necessary to comply with our instructions. And probably UNR will not have to wait that long. If one or more potential victims of asbestosis file or attempt to file a claim, the district court may decide to reconsider its refusal to appoint a representative for them. Cf.
 
 Coopers & Lybrand v. Livesay, supra,
 
 437 U.S. at 469 and n. 11, 98 S.Ct. at 2458 and n. 11. And if it does not, and denies the claim, and is reversed and the matter remanded, the question whether to appoint such a representative will appear to it in a wholly new light.
 

 We realize that reorganizations can be protracted and that the finality rule of section 1293(b) presupposes an opportunity for interlocutory appeals that
 
 Marathon
 
 has deprived the parties of. In the scheme of the 1978 Act, before
 
 Marathon
 
 knocked out key provisions of it, an order such as the district judge made in the present case would have been made by a bankruptcy judge, and though interlocutory his order would have been appealable either to a panel of three bankruptcy judges or to the district court, with the permission of either the panel or the court as the case may be. So there
 
 *1121
 
 would have been some appellate review, if leave to appeal had been granted. There has been none here. But the confused situation created by the
 
 Marathon
 
 holding will be clarified by new legislation, and this proceeding returned in its entirety to a bankruptcy judge, long before a final plan of reorganization is confirmed. And if the bankruptcy judge issues the same order that the district judge has issued, and that order is appealed to the district court, the district court’s order may be a final order appealable to us under the teaching of the
 
 Marin
 
 case. For all of these reasons the issue that UNR wants us to decide will probably come before us again before the final plan of reorganization is confirmed.
 

 UNR asks us, if we dismiss the appeal, to mandamus the district judge to certify his order for an immediate appeal under 28 U.S.C. § 1292(b). All other objections to the application aside, the prematurity of UNR’s appeal would make us unwilling to entertain a discretionary appeal at this time.
 

 Appeal Dismissed and Mandamus Denied.