**In re PLAYER WIRE WHEELS, LTD., Debtor.**

No. 09–40906.

United States Bankruptcy Court, N.D. Ohio.

Dec. 30, 2009.

Andrew W. Suhar, Suhar & Macejko, LLC, Youngstown, OH, for Debtor.

### MEMORANDUM OPINION REGARDING CONFIRMATION OF FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION

KAY WOODS, Bankruptcy Judge.

On December 16, 2009, the Court held a hearing ("Confirmation Hearing") on confirmation of First Amended Chapter 11 Plan of Liquidation ("Plan") (Doc. # 137) filed on November 3, 2009, by Debtor Player Wire Wheels, Ltd. ("Debtor"). The only party that objected to the Plan was Beverly A. Starr ("Mrs.Starr"), who filed Beverly A. Starr's Objection to Confirmation of First Amended Chapter 11 Plan of Liquidation and Brief in Support of Right to Object and be Heard ("Confirmation Objection") (Doc. # 153) on December 9, 2009. Debtor was represented at the Confirmation Hearing by Andrew W. Suhar, Esq. ("Mr.Suhar") and Melissa M. Macejko, Esq. Mrs. Starr was represented by Jerry M. Bryan, Esq. ("Mr.Bryan").

The Court first dealt with the preliminary matters of (i) Mrs. Starr's standing to be heard; and (ii) whether Mrs. Starr's ballot should be counted. This opinion memorializes that preliminary ruling and, to the extent this opinion may differ from or expand upon the bench ruling, this opinion controls.

This Court has jurisdiction pursuant to 28 U.S.C. § 1334 and the general order of reference (General Order No. 84) entered in this district pursuant to 28 U.S.C. § 157(a). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1391(b), 1408, and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The following constitutes the Court's findings of

fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I. BACKGROUND

By way of background, the Court held a hearing on November 4, 2009 ("Disclosure Hearing"), to consider Debtor's First Amended Disclosure Statement in Support of the Debtor and Debtor-in-Possession's Plan of Liquidation, as Amended ("Disclosure Statement") (Doc. # 136). On October 30, 2009, Mrs. Starr filed Beverly A. Starr's Objection to Disclosure Statement in Support of the Debtor's Plan of Liquidation ("Disclosure Objection") (Doc. # 134). At the Disclosure Hearing, the Court overruled the Disclosure Objection, finding that all of the issues raised by Mrs. Starr related to confirmation of the Plan rather than adequate disclosure. Debtor and Mrs. Starr did not agree: (i) whether Mrs. Starr was entitled to vote on the Plan; and/or (ii) whether Mrs. Starr was entitled to object to confirmation of the Plan.

As a consequence, the Court ordered Debtor to provide Mrs. Starr with a ballot, but held in abeyance a determination of whether that ballot would be counted. The Court further ordered the parties to submit simultaneous briefs no later than December 9, 2009, regarding Mrs. Starr's standing to (i) vote on the Plan; and/or (ii) object to the Plan. Debtor timely filed Debtor's Brief on Standing of Beverly A. Starr ("Debtor's Brief") (Doc. # 152). Mrs. Starr timely filed the Confirmation Objection.

Debtor is an Ohio limited liability company that was formed in 2000. At the time of formation, Ray A. Starr, Sr. ("Ray Starr") was the sole member of Debtor. Mrs. Starr and Ray Starr were formerly married, but their marriage was dissolved in 2005. In connection with the dissolution of their marriage, Mrs. Starr and Ray Starr entered into a Separation Agreement, pursuant to which Ray Starr agreed to pay Mrs. Starr $11 million to equalize the division of marital property. Part of the property settlement involved a $5.5 million promissory note ("Note") to be paid by Ray Starr to Mrs. Starr over a five-year period at 5% simple interest. This debt was to be paid in equal monthly installments of $105,000.00 payable on the first day of the month beginning October 1, 2005. In connection with the Note, Ray Starr executed a Pledge Agreement dated August 4, 2005, whereby Ray Starr pledged as security for the Note all of the membership units of Debtor. Pending payment in full of the Note, the membership units were held in escrow, 20% of which were to be released each year upon completion of payments to Mrs. Starr.

Ray Starr died on September 6, 2008. At the time of his death, Ray Starr had made monthly Note payments to Mrs. Starr for three years, which resulted in payment of 60% of the Note's balance. The Note was not paid in full at the time of Ray Starr's death. Subsequent to Ray Starr's death, the executors of Ray Starr's estate, Roy L. Crick and David Starr (collectively, "Executors"), made five monthly payments on the Note to Mrs. Starr (October through December 2008, and January and February 2009). Prior to Ray Starr's death, the escrow agent had released 40% of the membership units, but had not released the 20% relating to the third-year payments. The Note was not paid in full within 180 days after the death of Ray Starr.

As a consequence, at the time Debtor filed this chapter 11 case on March 21, 2009 ("Petition Date"), the estate of Ray Starr, acting through the Executors, owned all of the membership interest in

Debtor.[1] Mrs. Starr has alleged a default under the Note and the Pledge Agreement, which dispute is being arbitrated in a separate proceeding. Mrs. Starr represents that an arbitration hearing was held on December 7, 2009, but that the hearing was not concluded. (Confirm. Obj. at 2 and 9.) Mrs. Starr also indicates that a subsequent hearing will be held in January or February 2010, but no date for such hearing has been specified.[2] (*Id.*) As a consequence, the Executors continue to hold all of the membership interest in Debtor. Despite Mrs. Starr's numerous references in the Confirmation Objection to herself as a member of Debtor, she does not have that status. As such, Mrs. Starr is not an equity holder of Debtor.

Neither is Mrs. Starr a creditor of Debtor. Only the estate of Ray Starr owes Mrs. Starr a debt relating to the Note; Debtor owes no money to Mrs. Starr.

## II. IS MRS. STARR A PARTY IN INTEREST WITH THE RIGHT TO BE HEARD REGARDING CONFIRMATION OF THE PLAN?

Although the two issues are related, there are two separate questions for the Court to decide concerning Mrs. Starr. The first question: Is Mrs. Starr a party in interest with the right to object to and/or be heard regarding the Plan?

Section 1128(b) of the Bankruptcy Code provides: "A party in interest may object to confirmation of a plan." 11 U.S.C. § 1128 (West 2008). The term "party in interest" is not defined although § 1109(b) provides: "A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109 (West 2008).

All courts that have considered the issue recognize that the list of persons/entities who may be parties in interest in § 1109 is not exhaustive. Consequently, a bankruptcy court must look at the facts and circumstances in each case to determine if a person or entity is a party in interest. The bankruptcy court in *In re Ionosphere Clubs, Inc.*, 101 B.R. 844 (Bankr.S.D.N.Y.1989) held:

> The bankruptcy court must determine a party's status on a case by case basis to see if this party has a sufficient stake in the proceeding which would require representation.... [O]ne purpose of the Code is to convert the bankrupt's estate into cash and distribute it among creditors.... The term party in interest should be interpreted in light of this purpose. Consequently the party requesting standing must either be a creditor of a debtor to invoke the court's jurisdiction or be able to assert an equitable claim against the estate.

*Id.* at 849. In the *Ionosphere* case, the bankruptcy court determined that a group attempting to compel Eastern Air Lines, Inc. to adopt a specific refund procedure for pre-petition ticket holders did not have standing as a party in interest because the group "has no direct financial relationship to Eastern and has no right to direct reimbursement for airline tickets." *Id.* at 850.

1. This issue was more fully addressed in the Court's Memorandum Opinion Regarding Motion to Dismiss (Doc. # 48) dated April 9, 2009, the relevant parts of which are incorporated herein.

2. At the Confirmation Hearing, Mr. Bryan acknowledged that no further date has been identified for continuation of the arbitration hearing. Moreover, Mr. Bryan stated that the arbitrator is not required to issue a decision within any specified time period after conclusion of the arbitration hearing.

In contrast, the bankruptcy court in *In re Johns–Manville Corp.,* 68 B.R. 618 (Bankr.S.D.N.Y.1986) permitted a representative of future asbestos claimants to raise objections to a proposed plan of reorganization because they had a stake in the reorganization plan. The court held:

> The future claimants are parties in interest, as defined by the Code, § 1109. *In re Johns–Manville Corp.,* 36 B.R. at 746; *and see, In re Amatex Corp.,* 755 F.2d 1034, 1041 (3rd Cir.1985) ("Whether or not future claimants have claims in the technical bankruptcy sense that can be affected by a reorganization plan, such individuals clearly have a practical stake in the outcome of the proceedings."); *accord, In re UNR Industries, Inc.,* 725 F.2d 1111 (7th Cir.1984).

*Id.* at 628.

In *Intervention by Shareholders of Penn Central Co. (In re Penn Central Transportation Co.),* 328 F.Supp. 1273 (E.D.Pa.1971), the shareholders of the parent company of the debtor sought to intervene in the debtor's case. The court denied the various motions to intervene, finding that the rights of the shareholders in the parent company were being adequately represented by (i) the parent company itself; and (ii) one of the largest shareholders in the parent company (who was already a party to the proceedings). The court stated:

> Denial of intervention does not, as suggested in the Feldgoise brief, reflect a judgment that equity interests are valueless. And *I express no view as to whether these petitioners would have standing* to file a proposed plan of reorganization, or *to appear before* the ICC or *this Court in connection with any plan of reorganization which may ultimately be proposed.* ... General intervention in the reorganization, with the right to litigate and appeal virtually every action of the Trustees in their conduct of the affairs of the Debtor, should not be extended to these petitioners.

*Id.* at 1276 (emphasis added).

In the present case, Mrs. Starr seeks to be heard to object to confirmation of the Plan. Her main complaint appears to be that the Plan undervalues the membership units of Debtor and, consequently, her rights as the pledgee of such membership units will be impaired by confirmation of the Plan. Based on these circumstances, Mrs. Starr, as a practical matter, has a stake in Debtor's proposed Plan. There is no other entity similarly situated to Mrs. Starr. There is no other entity who can or does represent the same interest Mrs. Starr has in the valuation of the membership units of Debtor. As a consequence, this Court finds that, for purposes of § 1128(b), Mrs. Starr is a party in interest. As such, she will be permitted to be heard regarding the Confirmation Objection.

### III.   IS MRS. STARR ENTITLED TO VOTE ON THE PLAN?

The second question is whether Mrs. Starr has a right to vote on the Plan—in other words, should Mrs. Starr's ballot be counted? As set forth above, Debtor does not owe any debt to Mrs. Starr. Debtor did not schedule Mrs. Starr as a creditor and Mrs. Starr has not filed a proof of claim. Mrs. Starr has no claim against the bankruptcy estate—either allowed or disputed. Indeed, in completing the ballot, Mrs. Starr acknowledges that she does not hold a claim in any of the classes set forth in the Plan. Mrs. Starr does not purport to assert a secured or unsecured claim against Debtor; rather, she alleges on the ballot that she is "a party in interest with a *security claim* against the Debtor in the unpaid amount of $2,067,516.45." (Ballot, emphasis added.) Even though Mrs. Starr claims an

"unpaid amount of $2,067,516.45," this is not a debt that the Debtor owes to her; as set forth above, it is a debt that Mrs. Starr can assert and has asserted against the probate estate of Ray Starr. Under the most liberal interpretation of the facts, Mrs. Starr has merely the *potential* for being a member of Debtor and holding a Class 5 claim.

Section 1126(d) of the Bankruptcy Code describes what constitutes acceptance of a plan by equity holders. "A class of interests has accepted a plan if such plan has been accepted by holders of such interests, ... that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, ... that have accepted or rejected such plan." 11 U.S.C. § 1126 (West 2008). Currently, the Executors hold 100% of the membership units in Debtor. The Executors have voted to accept the Plan. Accordingly, Class 5 has voted to accept the Plan.[3]

Mrs. Starr argues that, at some indeterminate time in the future, she will prevail in the arbitration and the escrow agent will be ordered to release to her all of the membership units being held in escrow. There is reason to believe that, even if Mrs. Starr prevails in establishing a default, she will not be entitled to receive all 60% of the membership units being held by the escrow agent; instead, the most likely scenario appears to be that Mrs. Starr may be entitled to have 40% or less of the membership units released to her. Since either Ray Starr or his probate estate paid 41 of the 60 monthly payments due under the Note to Mrs. Starr (approximately 68%), the amount of membership units in relation to the remaining unpaid balance of the Note is 32%. If 32% of the membership units were to be distributed to Mrs. Starr, the Executors would exercise more than two-thirds of the amount of equity interests in Debtor, which have been voted to accept the Plan. Notwithstanding receipt of more than 68% of the Note, Mrs. Starr argues that 60% of the membership units will be released to her at some time in the future. This argument highlights why Mrs. Starr's ballot should not and cannot be counted. It is entirely speculative at this point in time whether, to what extent, and/or when Mrs. Starr may be an equity holder in the future. Mrs. Starr offers no legal support for the argument that she has the right to vote based on a speculative future equity interest.

It is beyond dispute that the purpose of the arbitration is to determine *if* there has been a default under the Note and Pledge Agreement and, if so, whether all or a portion of the membership units held in escrow are to be released to Mrs. Starr. Mr. Bryan asserted at the Confirmation Hearing that the estate of Ray Starr has admitted payment defaults under the Pledge Agreement. Mr. Suhar countered that, although there is no dispute that the Note has not been paid in full, the probate estate does not believe there has been a default because it alleges Mrs. Starr breached the Separation Agreement by aiding her sons in competing against Debtor. This Court reiterates the parties' arguments without comment on their accuracy or merit, but merely to demonstrate that there is, indeed, a live dispute concerning whether there has been a default and whether Mrs. Starr has any right to any membership units of Debtor. Notwithstanding the ongoing and unresolved

**3.** If, *arguendo*, Mrs. Starr's ballot were to be counted in an amount more than one-third based on ownership of more than 33% of the membership units, then Class 5 would be deemed to reject the Plan. Assuming, *arguendo*, that this state of affairs existed, the Plan could still be confirmed pursuant to § 1129(b).

arbitration, Mr. Bryan argued that Mrs. Starr has a "present interest in those membership rights, the membership interests of this company, as a result of those admitted defaults." (Hr'g Tr. at 1:58:14.) As set forth above, Debtor denies that the estate of Ray Starr has admitted any default in the arbitration proceeding. Moreover, Mr. Bryan failed to articulate what present interest Mrs. Starr has in the membership interest and how such alleged present interest can be asserted in this bankruptcy. Indeed, to the extent Mrs. Starr believes that she currently has a claim against Debtor based on this alleged "present interest," she was required to file a proof of claim. Mrs. Starr's argument is contradicted by the fact that she failed to do so.

■ In connection with Mrs. Starr's alleged right to vote on the Plan, she argues that the Court's consideration of this Plan is premature. Mrs. Starr cites no statutory authority or case law to support her argument that the Court cannot or should not consider confirmation of the Plan at this time. The Bankruptcy Code anticipates that a chapter 11 debtor will move quickly to emerge from bankruptcy protection. Section 1121(a) provides that a *"debtor may file a plan* with a petition commencing a voluntary case, or *at any time in a voluntary case* [.]" 11 U.S.C. § 1121 (West 2008) (emphasis added). Since there is no statutory reason for the Court to wait to hold a hearing to confirm the Plan, Mrs. Starr argues that consideration is premature because: (i) an arbitration proceeding is pending, resolution of which may determine that Mrs. Starr has an equity interest in Debtor; and (ii) a lawsuit has been filed in state court to

contest the will of Ray Starr and to remove Mr. Crick as Executor.

Mrs. Starr posits that, if she is successful in the arbitration, she will own an equity interest in Debtor, under which circumstances she would propose a plan of reorganization to keep Debtor operating. Mrs. Starr's suggestion contrasts with the Plan, which proposes a sale of the assets and keeps the business operating under different ownership. Mrs. Starr asserts that, if she becomes an equity owner, Debtor will not be able to propose this Plan without her consent, which she will not give. At the same time, however, Mrs. Starr maintains that she will be able to propose a plan of reorganization, without addressing whether she can obtain the consent of the Executors. Under no set of circumstances presented to this Court does Mrs. Starr contend that she would hold 100% of the membership rights in Debtor.[4] Since Mrs. Starr, at best, may have 60% of the membership units released to her in the future, she would be bound by the same Ohio law that she claims requires the unanimous consent of all owners of an Ohio limited liability company to propose a plan in bankruptcy. As a consequence, even under Mrs. Starr's best case scenario, she would not be able to act alone in the future, but she would be required to reach a consensus with the Executors. However, as pointed out by Mr. Suhar, Mrs. Starr would have difficulty proposing a plan of reorganization for the continued operation of Debtor since Debtor does not own the real estate upon which Debtor's business is operated. John K. Lane ("Mr. Lane") of Inglewood Associates LLC ("Inglewood") testified that National City Bank, n/k/a PNC Bank ("Bank"), which

4. The arbitration deals only with whether there has been a default and, if so, whether and to what extent the escrow agent will be required to release membership units to Mrs. Starr. The escrow agent holds only 60% of the membership units since 40% were released, pursuant to the Pledge Agreement, prior to Ray Starr's death.

holds a security interest in all of Debtor's collateral, required a mortgage on that property as additional collateral as a condition to continue to provide future financing for the business. The real property in question is owned by a wholly separate Trust for which Mr. Crick is trustee.

In addition to the pending arbitration, Mrs. Starr insists that consideration of this Plan is premature because a lawsuit is pending in state court seeking to remove Mr. Crick as Executor of the estate of Ray Starr. Mr. Bryan conceded at the Confirmation Hearing that no trial date has been established for the will contest proceeding.

This Court is not required to wait to consider a plan of reorganization or liquidation until all of the parties deem it to be ripe. There is no "best time" for a company to emerge from chapter 11 protection. Mrs. Starr has not been able to offer any time frame when either the arbitration or the will contest lawsuit may be resolved. At minimum, there will not be any ruling in either proceeding for several months.[5]

Mrs. Starr's argument concerning "prematurity" totally ignores the fact that Debtor is able to keep operating only because the Bank has agreed to Debtor's use of cash collateral. Debtor and the Bank have entered into ten interim orders for the use of cash collateral, the most recent such order being Tenth Interim Order Authorizing Debtor's Use of Cash Collateral Under 11 U.S.C. Section 363(c)(2) ("Tenth Cash Collateral Order") (Doc. # 155) entered on December 10, 2009. The Tenth Cash Collateral Order authorizes Debtor to use the Bank's cash collateral, subject to certain restrictions, only through January 22, 2010, unless the Bank consents or as

otherwise authorized by Court order. The Bank has accepted the Plan and is willing to continue funding the new owner of the business on terms that provide the Bank with a mortgage on the real estate where Debtor operates. This mortgage will be provided in addition to the other collateral the Bank currently has. Such mortgage is possible only because, if the Plan is confirmed, the owner of the business assets and the owner of the real estate will be one and the same entity. Mr. Lane testified that he was the one to suggest that a mortgage on the real property might satisfy the Bank's concerns regarding additional security. Mr. Lane further testified that Debtor would not be able to continue to operate without letters of credit, which Debtor could not obtain without the Bank being willing to lend more money. The Bank is willing to lend to the purchaser of Debtor's assets, as provided for in the Plan, which will keep the business in operation and preserve the jobs of Debtor's current employees.

As a consequence, the argument of "prematurity" boils down to Mrs. Starr's desire that this Court wait for some indefinite period—that will be at least months and possibly years in the future—until the arbitration and will contest proceedings are resolved. Meanwhile, Debtor could lose its ability to continue to operate at all, which would result in a forced liquidation (under either chapter 11 or chapter 7). Mrs. Starr offers no justification for the Court to conclude that she would be able to propose a feasible plan of reorganization if she becomes an equity owner of Debtor. Mrs. Starr offers only wishful thinking about her ability to propose a feasible plan

---

**5.** The arbitration is likely to be resolved first since that hearing has commenced. There is, however, no date scheduled for continuation of the hearing, which is anticipated to occur in "January or February 2010." There is no suggestion that the arbitration will conclude after one additional day of hearing. Whenever the arbitration is concluded, the arbitrator has an indefinite period of time to issue a decision.

in the event she actually becomes an equity owner of Debtor. As a consequence, the Court finds no merit to Mrs. Starr's argument that consideration of the Plan is premature.

As set forth above, Mrs. Starr is not a member of Debtor and she is not an equity security holder; consequently, she does not hold a Class 5 claim. Because Mrs. Starr is neither a creditor nor an equity security holder of Debtor, she is not entitled to vote on Debtor's Plan. Accordingly, the Court will not count the ballot Mrs. Starr completed.

## IV. DOES THE PLAN COMPLY WITH 11 U.S.C. § 1129?

Section 1129 of the Bankruptcy Code sets forth the requirements that must be met in order for a court to confirm a plan. Debtor represents that it has met all of the requirements in § 1129(a). Specifically, Debtor notes that, in compliance with § 1129(a)(8), 100% of all votes cast—*i.e.*, all classes—accepted the Plan. Debtor represents that all other requirements in § 1129(a) have also been met.

Mrs. Starr objects to confirmation on the basis that the Plan does not comport with § 1129(a)(3) and (7). Mrs. Starr does not dispute that the Debtor has met all of the other criteria in § 1129(a). Therefore, based upon the pleadings, the Ballot Tabulation Report (Doc. # 151), the testimony at the Confirmation Hearing, and the representations and arguments of Debtor's counsel, this Court finds and holds that all requirements of 11 U.S.C. § 1129(a)(1), (2), (4), (5), (6), (8), (9), (10), (11), (12), (13), (14), (15), and (16) have either been met or are not applicable to Debtor's case. The Court will address the two subsections that form the basis of Mrs. Starr's objection—*i.e.*, § 1129(a)(3) and (7).

### A. 11 U.S.C. § 1129(a)(3)

■ Subsection (3) of § 1129(a) provides that the Court may only confirm the Plan if it "has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129 (West 2008). Mrs. Starr argues that Debtor's Plan fails to meet both of these criteria. First, Mrs. Starr alleges that Debtor did not propose the Plan in good faith because the timing, substance, and results of the Plan are all designed to harm her and only her. Second, Mrs. Starr argues that the Plan violates Ohio law regarding limited liability companies because the actions to be taken under the Plan, if confirmed, would require the unanimous consent of all parties who have membership rights in Debtor.

*This Court finds no support for Mrs. Starr's argument that the Plan violates Ohio Revised Code §§ 1705.25 or 1705.43.* Each of the sections cited by Mrs. Starr in the Confirmation Objection as violations of Ohio law require Mrs. Starr to hold a membership interest in Debtor before her consent is required. As set forth in detail above, Mrs. Starr does not hold any membership interest in Debtor. As a consequence, the Plan does not and cannot violate Ohio law regarding limited liability companies. Accordingly, the Court finds that the Plan meets the requirement that it has not been proposed by any means forbidden by law.

■ Mrs. Starr also argues that the Plan has not been proposed in good faith because she is the only person that will be harmed by the Plan, if confirmed. Mrs. Starr contends that there are defects in the appraisal and the liquidation analysis; Mrs. Starr maintains that Debtor adopted such defective analyses only to cut off Mrs. Starr's rights. Debtor countered this argument with two witnesses: (i) Mr. Lane of Inglewood; and (ii) Steven D. Steer ("Mr.Steer") of Hack, Steer & Company,

LLC. Mr. Lane was appointed and retained as a turnaround professional for Debtor shortly after the Petition Date. (*See,* Final Order Authorizing the Employment and Retention of Inglewood Associates LLC as Turnaround Management to the Debtor (Doc. # 43) entered on April 6, 2009.) Mr. Steer, who is a Certified Valuation Analyst, was designated as an expert on business valuation.[6]

Mr. Lane testified that, along with Mr. Crick, he negotiated with the Bank to resolve the Bank's issues regarding collateral and to overcome the Bank's objections to the first plan of reorganization proposed by Debtor.[7] Mr. Lane testified that: (i) Debtor's intent in proposing the Plan had nothing to do with Mrs. Starr; (ii) the issue of Mrs. Starr never came up in discussions with the Bank; and (iii) Mrs. Starr and her alleged interest in Debtor were not factors in Mr. Lane's negotiations or analyses.

Mr. Steer testified that, in his expert opinion, the value of the total equity interest of Debtor as of August 31, 2009, was $385,000.00. Mr. Steer stated that he valued the equity of Debtor, not Debtor's assets. He also disputed Mr. Bryan's characterization of the equity valuation as having been discounted twice (*i.e.,* the "double discounting" argument). Mr. Steer testified that, in fact, the $385,000.00 value he placed on the equity interest was discounted only by a 10% risk factor; it was not discounted as Mr. Bryan contended.

As a consequence, Debtor established that it proposed the Plan in good faith based upon objective analyses of third party experts. For these reasons, the Court overrules Mrs. Starr's objection to confirmation of Debtor's Plan based on failure to meet the requirements in 11 U.S.C. § 1129(a)(3).

### B. 11 U.S.C. § 1129(a)(7)

█ The short answer to Mrs. Starr's objection based on § 1129(a)(7) is that the requirements of such subsection are expressly met because each class of claimants has accepted the Plan. Section 1129(a)(7) provides:

> With respect to each impaired class of claims or interests—
>
> (A) each holder of a claim or interest of such class—
>
> (i) has accepted the plan; or
>
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date[.]

11 U.S.C. § 1129 (West 2008). The Ballot Tabulation Report establishes that each class of claims voted to accept the Plan. As a consequence, the express terms of § 1129(a)(7)(A)(i) have been met. Mrs. Starr's objection based on subsection (a)(7) can only have efficacy if she holds a valid equity interest in Debtor and if her ballot should have been counted as part of Class 5. As set forth above, Mrs. Starr does not have a claim (either allowed or disputed) or an equity interest in Debtor's case and, consequently, she is not a member of any class of claims under the Plan.

---

**6.** Mrs. Starr did not object to the designation of Mr. Steer as an expert and did not question the credentials of either Mr. Lane or Mr. Steer.

**7.** On July 18, 2009, Debtor filed Debtor's Plan of Reorganization (Doc. # 98). Debtor filed Notice of Withdrawal of the Debtor's Chapter 11 Plan of Reorganization (Doc. # 126) on September 29, 2009.

■ If, *arguendo*, Mrs. Starr were deemed to hold an equity interest in Debtor, the Plan would meet the requirements of § 1129(a)(7)(A)(ii).[8] Subsection (ii) requires that each holder of a claim or interest retain on account of such claim or interest a value, as of the effective date of the plan, that is not less than the amount such holder would receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code. Mrs. Starr argues that the value Debtor places on the membership interests in the amount of $385,000.00 is "defective" and too low. Mrs. Starr did not object to Mr. Steer being qualified as a valuation expert. Mr. Steer expressly testified that, in his expert opinion as a Certified Valuation Analyst, the value of the equity (not the inventory) of Debtor as of August 31, 2009, was $385,000.00. Mrs. Starr challenged Mr. Steer's valuation through cross-examination, but she offered no testimony (or even argument) concerning the value of Debtor's equity. Mr. Steer testified that he utilized the asset method to value Debtor's equity because it was the only method that resulted in a positive value for the membership interest. He testified that all analyses using the income method of valuation resulted in a negative value for the membership interest.

Mr. Steer testified that he did not value the equity of Debtor by dividing the Hilco valuation (taken in July 2008) in half, as Mr. Bryan maintained.[9] Mr. Steer stated that he looked at the marketability of Debtor's business in valuing Debtor's equity and that such marketability had no relationship to the value of Debtor's inventory. Although Mrs. Starr challenged Mr. Steer's valuation amount through cross-examination by Mr. Bryan, Mrs. Starr failed to present any evidence that Mr. Steer's valuation of Debtor's equity was not accurate.

Mrs. Starr argued that Inglewood—Debtor's turnaround management with expertise concerning Debtor's financial condition—had valued the equity interest at more than $3.1 million. Mrs. Starr's objection to the undervaluation of Debtor's equity was based on Appendix ii to Debtor's Disclosure Statement, which had been prepared at the direction of Mr. Lane. Mrs. Starr argued that Debtor's Appendix ii shows $3, 143, 476.52 as "Cash (Shortfall)/Excess on Liquidation—August 31 Values" under an "Orderly" liquidation scenario. As a consequence, Mrs. Starr contended that Inglewood valued the amount to be distributed to Debtor's equity holders as more than $3.1 million.

However, Mr. Lane's testimony contradicted this argument. Mr. Lane testified that Appendix ii was based on the book value of Debtor's assets as of August 31, 2009. Appendix ii shows three different scenarios for liquidating Debtor's assets—not a valuation of Debtor's equity. These three scenarios are: (i) Forced; (ii) Using the methodology utilized by Hilco; and (iii) Orderly. The first scenario assumes that Debtor would not be operating and that there would be an auction to sell all of the inventory through an auctioneer or liquidator (none of Debtor's employees would be involved in this type of sale). The sale

8. Section 1129(a)(7)(B) does not apply to this case because § 1111(b)(2) does not apply.

9. Mr. Bryan attempted to impugn the Hilco valuation by questioning who Hilco was. Mr. Suhar countered this attack with the explanation that Hilco is a well-known and respected international company that appraises a company's sale value when it is going out of business. Mr. Suhar explained that Hilco was retained by the Bank in the summer of 2008 because the Bank wanted to know the true value of Debtor's inventory in the event it had to be liquidated to pay the debt to the Bank.

would be advertised, as appropriate, and the parties who came to the auction would know that this was, in essence, a "fire sale." This analysis resulted in a 24% recovery of the book value.

The second scenario was based on the Hilco methodology. Mr. Lane testified that Hilco is an international firm that values inventory and sells such inventory through a different kind of auction process. Hilco had been hired by the Bank in July 2008 to value Debtor's inventory. Mr. Lane said that he used the same methodology that Hilco had utilized, but different book values based on the passage of time. This methodology provides for a "blow out" sale for approximately one month at which time the company would still be operating and the market would not be informed that the company anticipated cessation of operations. This sale would be conducted by Debtor's employees at the regular store facility. After the sale period concluded, a liquidator would conduct an auction that would likely result in a lower rate of return than the "blow out" sale.

The third scenario was based on an orderly sale of Debtor's inventory while Debtor continued to operate. Sale of inventory under this scenario would be conducted by Debtor's employees. Inventory would be discounted and discounts would increase over time to move the inventory. Mr. Lane testified that this is a very managed process and it assumes that the status quo regarding Debtor's business continues.

Mr. Lane testified that a forced liquidation, which would occur in chapter 7, would result in a shortfall payment to the Bank of $633,000.00, in which case unsecured creditors and equity holders would receive nothing. (Hr'g Tr. at 2:41:30.) Mr. Lane further testified that columns 2 and 3 of appendix ii are contrary to a chapter 7 analysis because, in order to obtain the highest possible prices, each analysis presumes that the public would be unaware that Debtor would be ceasing operations and liquidating. (*Id.* 2:42:46.)

As a consequence, this Court finds that the values on Appendix ii are values relating to the liquidation of Debtor's inventory and do not purport to value the equity of Debtor. The only testimony regarding the value of the equity interest of Debtor was offered by Mr. Steer, who valued such interest at $385,000.00. Based upon Mr. Lane's testimony, Mrs. Steer's valuation exceeds the amount that holders of equity interests would receive in a chapter 7 liquidation. The Plan provides for Debtor to turn over $385,000.00 to Ray Starr's probate estate to be held until the arbitration is concluded and then distributed based upon the resolution of that arbitration. Accordingly, Mrs. Starr retains all of the rights she currently has in the membership interests as collateral for the debt owed to her by the estate of Ray Starr and she will receive not less than the amount that she would receive if Debtor were to be liquidated under chapter 7 of the Bankruptcy Code.

Since 11 U.S.C. § 1129(a)(7) is satisfied under either (A)(i) or (A)(ii), the objection of Mrs. Starr fails.

### V. CONCLUSION

This Court finds that Mrs. Starr is a party in interest for purposes of 11 U.S.C. § 1128(b), and thus was entitled to be heard and present the Confirmation Objection. This Court further finds and holds that Mrs. Starr's ballot should not be counted since she is not a member of any class of claims under the Plan and because she does not hold a claim against or an equity interest in Debtor.

For the reasons set forth above, the Court overrules Mrs. Starr's *Confirmation Objection* in its entirety. *Consideration of the Plan at this time is not premature.* The Plan meets all relevant requirements in 11 U.S.C. § 1129, including §§ 1129(a)(3) and (7).

An appropriate order will follow.

**ORDER: (i) OVERRULING OBJECTION OF BEVERLY A. STARR; (ii) DETERMINING BALLOT OF BEVERLY A. STARR SHALL NOT BE COUNTED; AND (iii) CONFIRMING FIRST AMENDED CHAPTER 11 PLAN OF LIQUIDATION**

For the reasons set forth in this Court's *Memorandum Opinion Regarding Confirmation of First Amended Chapter 11 Plan of Liquidation* entered on this date, the Court hereby finds: (i) Beverly A. Starr ("Mrs.Starr") is a party in interest for purposes of 11 U.S.C. § 1128(b) and is entitled to be heard and present Beverly A. Starr's *Objection to Confirmation of First Amended Chapter 11 Plan of Liquidation and Brief in Support of Right to Object and be Heard* ("Confirmation Objection"); (ii) Mrs. Starr is not a member of any class of claims under the First Amended Chapter 11 Plan of Liquidation ("Plan") and does not hold a claim against or an equity interest in Debtor Player Wire Wheels, Ltd. ("Debtor"); (iii) Mrs. Starr's ballot shall not be counted; (iv) the Plan meets all relevant requirements in 11 U.S.C. § 1129; (v) the Confirmation Objection is overruled in its entirety; and (vi) the Plan is confirmed.

**IT IS SO ORDERED.**